FILED
2021 MAR 30
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE CO.,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL BAKER INTERNATIONAL, INC.,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00881-JNP<br><br>District Judge Jill N. Parrish |

## INTRODUCTION

Before the court is a Motion for Partial Summary Judgment filed by Plaintiff Liberty Mutual Fire Insurance Co. ("Liberty"). Liberty seeks a declaratory judgment that it need not provide coverage for or defend two lawsuits brought against its insured, Michael Baker International, Inc. ("MBI"). For the reasons set forth herein, the court DENIES Liberty's motion.

## FACTUAL BACKGROUND

This dispute centers on two lawsuits against MBI for injuries suffered in a construction zone at which MBI was performing work. MBI is an engineering firm. In April 2017, it entered into a Professional Services Agreement with RLW/Clyde, a contractor, under which MBI would provide "engineering and other design professional services" in connection with the construction of "4 Interchanges on Bangerter Highway." ECF No. 81-2 at 39, 60. The interchanges are located at the intersection of 11400 South and Bangerter Highway in South Jordan, Utah.

## I.      Underlying Lawsuits against MBI

Two separate accidents occurred at the intersection. In August 2017, Audrey Yaeger ("Yaeger") was walking eastbound on 11400 South when she was struck by a car traveling southbound on Bangerter Highway. In November 2018, she sued MBI, along with several other defendants involved in the construction project, in Utah state court, asserting a single cause of action for "negligence/ recklessness." She alleged that the defendants, including MBI, breached their duty of care by acting negligently in the following ways:

   a.  By failing to provide proper, working, and/or adequate crosswalk signals at the Intersection;

   b.  By failing to provide a safe crosswalk for pedestrians at the Intersection;

   c.  By failing to provide a safe detour for pedestrians to cross the Intersection;

   d.  By failing to remedy a defective, unsafe, and/or dangerous condition at the Intersection;

   e.  By failing to place adequate warnings and/or instructional signage at and near the Intersection;

   f.  By failing to comply with applicable standards, codes, and regulations for traffic control and signage at the Intersection;

   g.  By failing to properly hire, train, retain, and/or supervise personnel working on the Construction Project;

   h.  By failing to comply with the applicable traffic-control plan for the Intersection;

   i.  For implementing and/or approving a defective traffic-control plan for the Intersection;

   j.  Creating a defective, unsafe, and/or dangerous condition at the Intersection; and/or

k.  Any other acts and/or omissions that may be later be [*sic*] discovered.

On January 25, 2018, JoElle Satterthwaite ("Satterthwaite") was driving northbound on Bangerter Highway with her young son, Jackson Satterthwaite (collectively "Satterthwaites" or "Satterthwaite plaintiffs"), in the back seat. Satterthwaite made a left turn onto 11400 South. As she was turning left, her vehicle was struck by a speeding motorist traveling southbound on Bangerter Highway. The Satterthwaite plaintiffs allege that until January 22, 2018, drivers were allowed to make such a turn; however, at the time of their accident such turns were not allowed. The Satterthwaites likewise sued MBI, among others, and asserted a single cause of action for "negligence/ recklessness." They made allegations nearly identical to Yaeger's—that MBI breached its duty of care:

a.  By failing to provide adequate signs, instructions, and traffic-control devices informing motorists that left-hand turns were no longer allowed;

b.  By failing to provide a traffic-control light on the west side of the large, east-west gap before motorists entered southbound traffic;

c.  By failing to remedy a defective, unsafe, and/or dangerous condition at the Intersection;

d.  By failing to comply with applicable standards, codes, and regulations for traffic control and signage at the Intersection;

e.  By failing to properly hire, train, retain, and/or supervise personnel working on the Construction Project;

f.  By failing to comply with the applicable traffic-control plan for the Intersection;

g.  By implementing and/or approving a defective traffic-control plan for the Intersection;

3

    h. By failing to have law enforcement personnel regulating traffic at the Intersection at the time of the incident;

    i. By failing to allow sufficient timing for motorists to get across the large, east-west gap before entering southbound traffic;

    j. By creating a defective, unsafe, and/or dangerous condition at the Intersection; and/or

    k. Any other acts and/or omissions that may later be discovered.

## II.   MBI's Insurance Policies

At the time of both accidents, MBI held Commercial General Liability ("CGL") policies issued by Liberty.[1] The CGL policies provide in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

ECF No. 66-1 at 26 (Section I Coverage A). The policies also contain amendatory endorsements titled "Exclusion—Designated Professional Services" and "Exclusion—Engineers, Architects or Surveyors Professional Liability." The court refers to these collectively as the "Professional Services Exclusions." The Professional Services Exclusions provide:

### Endorsement CG 21 16 04 13 (EXCLUSION – DESIGNATED PROFESSIONAL SERVICES)

> With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2. Exclusions of Section**

---

[1] Policy No. TB2-681-004145-716, valid from August 30, 2016 to August 30, 2017, applied to the Yaeger action. Policy No. TB2-681-001415-717, valid from August 30, 2017 to August 30, 2018, applied to the Satterthwaite action. The policy provisions relevant to this matter are identical.

**I – Coverage A – Bodily Injury and Property Damage Liability**
and Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

### SCHEDULE

**Description Of Professional Services:**

All professional services performed by or on behalf of the named insured.

. . .

### Endorsement CG 22 43 04 13 (EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY)

The following exclusion is added to Paragraph **2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

    1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

    2.   Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

As part of the CGL policies, in addition to the general aggregate coverage limit of $4,000,000, the parties agreed to a coverage limit of $4,000,000 for "Products-Completed Operations" ("PCO Coverage"). The PCO coverage provides coverage for "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' . . . ." *Id.* at 8, 40. "Your work" is defined as "(1)Work or operations performed by you or on your behalf; and (2) Materials, parts, or equipment furnished in connection with such work or operations." *Id.* at 41. It includes, among other things, "[t]he providing of or failure to provide warnings or instructions." *Id.*

MBI's Professional Services Agreement with RLW/Clyde also required it to obtain "Professional Errors and Omission Liability Insurance," which would "cover the negligent acts, errors, and omissions of the insured that provides professional services from [*sic*] the project." ECF No. 81-2 at 66. Accordingly, MBI obtained, from a different insurer, Architects and Engineers Professional Liability and Architects, Engineers and Contractors Pollution Liability coverage with an aggregate limit of $15,000,000. ECF No. 81-2 at 69. The court refers to this as MBI's "Professional Services Coverage."

### III.     Reservation of Rights and Defense

Liberty agreed to defend MBI in the above lawsuits subject to a reservation of rights. In a letter dated December 13, 2018, Liberty informed MBI that it would "provide a defense . . . subject to the following reservation of rights . . . ." ECF No. 88-1 at 2. The letter went on to explain that Liberty could "disclaim insurance coverage, in whole or in part, at a later date as warranted" and that "indemnification may not be available for the relief sought . . . ." *Id.* The letter outlined the Professional Services Exclusions in the policies as the grounds for its reservation of rights. *Id.* at 3. Liberty provided a defense for both lawsuits, hiring Robert Thompson ("Thompson") of the law firm Snow, Christensen, and Martineau.[2] The Yaeger case was defended and settled for an amount within MBI's deductible. The Satterthwaite case settled for an amount above the policy limits.

While the litigation in the Yaeger and Satterthwaite lawsuits was ongoing, on November 8, 2019, Liberty filed this declaratory judgment action. It seeks three declaratory judgments under 28 U.S.C. § 2201: (1) a declaratory judgment "that there is no coverage afforded for or duty to defend MBI in the lawsuits"; (2) if coverage is not excluded, a declaratory judgment determining whether MBI's policy with Liberty is excess insurance or primary insurance subject to sharing with MBI's other insurers, and (3) if coverage is not excluded, a declaratory judgment that Liberty need not cover any punitive damages assessed against MBI. In the present Motion for Partial Summary Judgment, Liberty moves for summary judgment only on its first cause of action: that it has no duty to defend or indemnify MBI for the Yaeger and Satterthwaite lawsuits. MBI initially moved

---

[2] In its briefs, MBI cites to several facts that it contends establish bad faith by Liberty and Thompson during their defense of MBI. While these facts may be relevant to MBI's counterclaims in this action, they are not relevant to determining whether Liberty is required to provide coverage for the Yaeger and Satterthwaite lawsuits.

the court to defer consideration of this motion until the close of fact discovery. The court granted MBI's motion in effect, *see* ECF No. 120, and allowed MBI to file a supplemental opposition brief. The court also permitted Liberty to file a supplemental reply brief.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Instead, the court must "view all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (citation and alteration omitted).

**DISCUSSION**[3]

## I.    Governing Law

As an initial matter, the parties dispute which state's law governs this dispute. Liberty argues that Utah law applies; MBI argues that Pennsylvania law governs. In a diversity case, federal courts are to apply the choice-of-law rules of the state in which they sit. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). To determine which state's laws govern a contract, Utah courts look to the state that has the "most significant relationship to the transaction and the parties." *Am. Nat'l. Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996) (quoting RESTATEMENT (SECOND) OF CONFLICT § 188 (AM. LAW INST. 1971)). In deciding which state has the most significant relationship to the contract, Utah courts consider five factors:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.*

---

[3] Liberty argues that this court should disregard portions of MBI's Supplemental Opposition. Specifically, Liberty argues that the court should disregard the portions of the brief that introduce new argument or introduce for the first time facts that MBI already had in its possession when it filed its initial Opposition. Liberty cites the court's Order (ECF No. 74), which allowed MBI to file a brief supplementing its initial Opposition with additional facts ascertained during discovery. It argues that MBI violated the order by making new arguments and raising facts to which it already had access. The court declines to disregard these portions of MBI's Supplemental Opposition. Any potential prejudice to Liberty was remedied because Liberty had the opportunity to file a Supplemental Reply and in fact filed one. Thus, Liberty was afforded a fair chance to respond to any new arguments presented in MBI's Supplemental Opposition.

Here, the contracts were negotiated and executed in Pennsylvania. Liberty issued the policies out of its Pennsylvania offices to a MBI, a Pennsylvania corporation based in Pennsylvania. Utah courts consider the place of performance of an insurance contract "to be the 'place of the insurer's payment of claims [to the insured] under the policy,' and typically the insurer makes payment of claims in the state where the insured is located." *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 276 P. 3d 1156, 1166–67 (Utah Ct. App. 2012). Thus, the first three factors weigh in favor of applying Pennsylvania law. The fifth factor similarly weighs in favor of applying Pennsylvania law because while neither of the parties is incorporated in or has its principal place of business in Utah, MBI is both incorporated and principally based in Pennsylvania.

Liberty argues that because the accidents at issue occurred in Utah, the fourth factor, the location of the subject matter of the contract, weighs in favor of applying Utah law. It argues that because the contracts afford protection against a localized risk in Utah, "the location of . . . the risk is significant and the state where . . . the risk is located will have a natural interest in transactions affecting it." ECF No. 68 at 19. But the policies do not provide for coverage of localized risk in Utah; rather, their terms dictate that coverage applies virtually worldwide. *See* ECF No. 81-2 at 151. Furthermore, the Utah Supreme Court has explicitly rejected the argument that Utah law should govern an insurance contract merely because Utah was the site of an accident. *See Am. Nat'l. Fire*, 927 P.2d at 190–91 ("Under the most significant relationship test, the location of the accident is not sufficient to outweigh numerous other contacts [with other states]."). The court therefore concludes that Pennsylvania law will govern this dispute.

## II.    Mootness Issues

As a further preliminary matter, both parties argue that certain issues presented in Liberty's Motion for Partial Summary Judgment are now moot. MBI argues that because the Yaeger lawsuit was defended and settled for an amount within MBI's deductible, there no longer exists a controversy on the issue of coverage for the Yaeger claims. Thus, MBI argues, a declaratory judgment regarding Liberty's duty to defend or indemnify MBI for the Yaeger claims would amount to an advisory opinion. Liberty does not dispute MBI's position, and the court agrees. The court will address only the Satterthwaite lawsuit in deciding this Motion.

Liberty argues that because it provided MBI a defense for the Satterthwaite case, which terminated in settlement, the issue of its duty to defend is now moot, and only the duty to indemnify requires resolution.[4] The court is unpersuaded by Liberty's argument. While it is true that Liberty provided MBI a defense in the case until its resolution, whether it had a duty to defend MBI will determine who bears the cost of that defense, MBI or Liberty. In addition, determining whether Liberty had a duty to defend will affect the outcome of MBI's counterclaims; MBI asserts a cause of action against Liberty for breaching its duty to defend the Satterthwaite case. *See* ECF No. 57 at 19–20.

---

[4] The duty to defend and the duty to indemnify are distinct. The duty to defend is broader, and "as long as the complaint might or might not fall within the policy's coverage the insurance company is obliged to defend." *Penn-America Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 265 (Pa. Super. Ct. 2011) (citation omitted). As detailed below, the court looks to the allegations in the complaint of the underlying lawsuit to determine whether the insurer is under a duty to defend, but the insurer may rely on evidence outside of the complaint to show that it ultimately has no duty to indemnify.

### III.     Professional Services Exclusion

Liberty argues that it is not required to cover the Satterthwaite claims against MBI because the claims arose from MBI's professional services. It argues that any claims for bodily injury or property damage that resulted from MBI's professional services are excluded from coverage under the Professional Services Exclusion in the applicable policy. MBI responds that not all of the claims brought against it were the result of professional services; rather, some of them arose from activities that fall outside the Exclusion's list of examples of professional services and require no specialized knowledge or skill. MBI further contends that adopting Liberty's interpretation of the Professional Services Exclusions would render illusory other coverage provisions contained in the policy, namely, the PCO coverage. Finally, it argues that because the Exclusion is ambiguous, the court may look to the prior course of dealing of the parties to interpret its meaning. MBI argues that the parties' course of dealing under similar policy provisions in the past shows that the claims at issue here should not be excluded from coverage.

#### A.     The Professional Services Exclusion Is Ambiguous

The court first must determine whether the Professional Services Exclusion is ambiguous. MBI argues that it is ambiguous because it contains only a circular definition—"professional services" means "all professional services," and a non-exhaustive list of examples of activities that constitute professional services. MBI contends that this renders the Exclusion ambiguous on its face; therefore, MBI argues, the Exclusion is subject to multiple reasonable interpretations. Liberty responds that MBI does not offer an alternative interpretation of the Exclusion and has therefore failed to show that it is ambiguous.

"Where [ ] the language of [an insurance policy] is clear and unambiguous, a court is required to give effect to that language." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469

A.2d 563, 566 (Pa. 1983) (citation omitted). Where a policy exclusion is ambiguous, however, it is to be strictly construed "in favor of the insured and against the insurer." *Id.* A policy provision is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense," *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006), or "if its terms are subject to more than one reasonable interpretation when applied to a particular set of facts." *Kropa v. Gateway Ford*, 974 A.2d 502, 508 (Pa. Super. Ct. 2009). When an insurance policy includes the term "professional services" but fails to define it, Pennsylvania courts consider the term to be ambiguous. *See Biborosch v. Transamerica Ins. Co.*, 603 A.2d 1050, 1056 (Pa. Super. Ct. 1992); *Danyo v. Argonaut Ins. Cos.*, 464 A.2d 501, 502–03 (Pa. Super. Ct. 1983); *Hartford Cas. Ins. Co. v. New Hope Healthcare*, 203 F. Supp. 2d 339, 346 (E.D. Pa. 2011) ("The insurance policy does not define the term 'professional services.' Instead, it sets out a non-exclusive list of examples. Thus, the phrase is ambiguous, and must be construed against Hartford.").

Here, the court concludes that the Professional Services Exclusion is ambiguous. The term "professional services" as set forth in the policy contains only a circular definition—"[a]ll professional services performed by or on behalf of the named insured"—and a non-exhaustive list of activities that constitute professional services. ECF No. 81-2 at 157–58.[5] Liberty's argument to the contrary is unavailing. It contends that MBI has not provided an "alternative reasonable interpretation" of the contract terms and that MBI's ambiguity argument therefore fails. But the

---

[5] The list provides the following examples of professional services: "1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and 2. Supervisory, inspection, architectural or engineering activities." ECF No. 81-2 at 158.

caselaw cited above does not require the insured to provide its own interpretation of the contract terms. Rather, the caselaw above finds contracts that leave the term "professional services" undefined to be ambiguous on their face, even when a non-exhaustive list of examples is included. *See, e.g., New Hope*, 203 F. Supp. 2d at 346.  Even if an insured were required to provide an alternate interpretation, MBI has arguably done so by pointing to several allegations in the underlying complaints that it contends do not fall under the umbrella of "professional services." *See* ECF No. 81 at 36–37 (arguing that failing to comply with the traffic control plan, creating a defective unsafe and/or dangerous condition, and failing to have a police officer at the site are not professional services); *Kropa*, 974 A.2d at 508 (policy term is ambiguous if subject to multiple interpretations as applied to a particular set of facts). Because the Professional Services Exclusion is ambiguous, the court will construe it in favor of MBI and against Liberty. In addition, because the Exclusion is ambiguous, the court may consider extrinsic evidence in interpreting its meaning, including the prior dealings of the parties. *See Metal Marketplace, Inc. v. United Parcel Serv.*, 733 F. Supp. 976, 978–79 (E.D. Pa. 1990) ("Critical evidence in determining intent is the parties' prior course of dealing under like contracts." (citing RESTATEMENT (SECOND) OF CONTRACTS § 223 (AM. LAW. INST. 1981)).[6]

---

[6] Liberty argues that the parties' prior course of dealing is inadmissible character evidence under Federal Rule of Evidence 404. But that rule excludes evidence that is offered to show that a party acted in accordance with its past behavior. Here, the parties' course of dealing is being offered to establish the meaning of a contract provision. It is a well-established tenet of contract law that courts may look to parties' course of dealing to understand their intent. *See* RESTATEMENT (SECOND) OF CONTRACTS § 223 (AM. LAW. INST. 1981). Indeed, a court may look to the parties' course of dealing even where a contract provision is unambiguous. *Id.*

B.      Liberty Bears the Burden of Showing the Exclusions Apply

When an insurer relies on a policy exclusion as the basis for denying coverage, it bears the

burden of proving by uncontradicted facts that the exclusion applies. *Butterfield v Giuntoli*, 670

A.2d 646, 651–52 (Pa. Super. Ct. 1995) (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d

1363, 1366 (Pa. 1987)). As a preliminary matter, MBI argues that Liberty may not rely on any

sources outside of the insurance policies and the complaints in the underlying actions to satisfy

this burden. In other words, MBI argues that the "four corners" rule applies. *See Sapa Extrusions,*

*Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 251–52 (3d Cir. 2019) ("The question of whether a

claim against an insured is potentially covered is answered by comparing the four corners of the

insurance contract to the four corners of the complaint." (citation omitted)). But the four corners

rule applies only where the duty to defend is the sole issue in a case. Indeed, the case MBI cites to

support its contention involves the duty to defend, not the duty to indemnify. *See Unitrin Direct*

*Ins. Co. v. Esposito*, 280 F. Supp. 3d 666, 671 (E.D. Pa. 2017). In contrast, where the duty to

indemnify is at issue, an insurer may rely on extrinsic evidence of later factual developments to

satisfy its burden to show that coverage is excluded. *See State Farm Fire & Cas. Co. v. DeCoster*,

67 A.3d 40, 46 (Pa. Super. Ct. 2013) ("Unlike the duty to defend, a determination of the duty to

indemnify is not necessarily limited to the factual allegations of the underlying complaint . . . . An

insurer may rely on evidence outside of the complaint to ultimately prove it has no duty to

indemnify." (citations omitted)). [7] Here, the duty to indemnify is at issue, and Liberty may

therefore rely on extrinsic evidence to satisfy its burden.

---

[7] MBI contends that where a case is settled, the duty to indemnify follows the duty to defend. In
other words, MBI argues that if Liberty breached its duty to defend, then it is estopped from
denying that it breached its duty to indemnify (and therefore may not provide extrinsic evidence

C.      Liberty Fails to Satisfy Its Burden to Show That Coverage Is Excluded

Liberty points to three sources to support its position that the Satterthwaite claims arose from professional services provided by MBI and that they are therefore excluded from coverage: (1) the allegations of the Satterthwaites' complaint, (2) MBI's Professional Services Agreement under which it agreed to provide "professional services in connection with the design" of the intersection of Bangerter Highway and 11400 South, and (3) MBI's Professional Services Coverage. It argues that each of the allegations in the Satterthwaite complaint falls into the category of professional services, evidenced in part by the fact that MBI contracted to provide "professional services."

The court is not persuaded that Liberty has met its burden to show that the claims against MBI are excluded under the Professional Services Exclusions. First, the two extrinsic sources it cites do not establish that MBI provided solely professional services or that the Satterthwaite claims arose solely from MBI's performance of professional services. That MBI purchased supplemental professional services insurance has no bearing on whether these particular claims arose from the performance of professional services. Likewise, the fact that the Professional Services Agreement provided that MBI would provide professional services in connection with

---

to deny coverage). This is because, MBI argues, when a case is settled, it is impossible to determine on what theories of liability the underlying plaintiffs recovered, since there are no findings of fact or admissions of negligence. While some courts applying Pennsylvania law have held that in the case of a settlement, the duty to indemnify necessarily follows the duty to defend, *see, e.g.*, *Pac. Indem. Co. v. Linn*, 590 F. Supp. 643, 650 (E.D. Pa. 1984), Pennsylvania courts have declined to adopt a "blanket rule that if there is a breach of a duty to defend and a settlement, then it automatically requires the breaching insurer to indemnify." *Am. States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 63–64 (Pa. Super. Ct. 1998). This court likewise declines to apply such a blanket rule. This decision, however, has little effect on the outcome of this motion for summary judgment, as Liberty offers scant evidence outside of the allegations in the underlying complaints. Thus, whether Liberty has a duty to indemnify will largely be determined by those allegations.

the construction of the intersection is not dispositive of this issue. While the contract was for professional services, MBI may have performed other work on the project that did not require specialized skill or knowledge, and the Satterthwaite claims may have arisen from the latter kind of work.[8]

Turning to the allegations in the Satterthwaite complaint, Liberty argues that they all fall under the applicable Professional Services Exclusions; MBI argues that some do not. Specifically, MBI argues that the following allegations in the Satterthwaite complaint are not excluded from coverage because they do not fall into the narrow list of activities listed in the Policy Exclusions as examples of professional services[9] and do not otherwise require specialized knowledge or skill:

A. Item f: failing to comply with the applicable traffic-control plan for the Intersection. MBI argues that this is akin to a driver running a red light or a manual laborer simply installing a stop sign in the wrong place. In other words, it does not necessarily involve "specialized knowledge, labor, or skill." *See Harad v. Aetna Cas. And Sur. Co.*, 839 F.2d 979, 984 (3d Cir. 1988).

---

[8] At oral argument, counsel for Liberty stressed that the Professional Services Agreement required MBI to obtain Professional Services Coverage. Counsel argued that this supports Liberty's contention that MBI was contracted to perform only professional services. This argument fails because the Professional Services Agreement required MBI to carry several different kinds of coverage, including general liability, worker's compensation, professional services, and others. *See* ECF No. 81-2 at 66.

[9] As stated above, that list includes the following: "1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and 2. Supervisory, inspection, architectural or engineering activities." ECF No. 81-2 at 158.

B. Item j: creating a defective, unsafe, and/or dangerous condition. MBI argues that such a condition could arise from activities other than professional services, such as digging a hole and failing to erect a barrier around it.

C. Item h: failing to have a police officer at the site. MBI argues that having a police officer at the site likewise does not require specialized skill or knowledge.

D. Item a: failing to provide adequate signs, instructions, and traffic control devices informing motorists that left-hand turns were no longer allowed. MBI argues that this allegation falls under its PCO coverage. If the court were to read claims such as these as excluded under the Professional Services Exclusion, MBI argues that its PCO coverage would be rendered illusory—any claim potentially covered under it would be excluded.

MBI also argues that the Satterthwaite complaint leaves unclear which allegations are made against MBI as opposed to the other defendants. Because of this, MBI argues, Liberty cannot meet its burden to show that every allegation of negligence arose from MBI's professional services.

The court agrees with MBI that Liberty has not met its burden to show by undisputed facts that all of the claims against MBI are excluded from coverage. As explained above, because the Professional Services Exclusion is ambiguous, the court must construe it strictly in favor of coverage. Construing it as such, the court cannot definitively determine that each of the allegations in the Satterthwaite complaint conclusively falls within the Professional Services Exclusions.[10] As

---

[10] Here, the court must look to the allegations in the complaint because Liberty failed to produce evidence of later factual developments that might have placed the suit outside of coverage. Liberty could have done so. *See DeCoster*, 67 A.3d at 46 ("Unlike the duty to defend, a determination of

MBI correctly observes, a reasonable juror could conclude that some of the allegations arise from activities that do not fall into the list of professional services included in the policies and that do not otherwise require specialized knowledge or skill.[11] In addition, the allegations in the complaint are vague as to which of the claims the plaintiffs assert against MBI and which claims they assert against other defendants. The court therefore concludes that Liberty has not met its burden to show that it had no duty to defend or indemnify MBI for at least some of the claims brought in the Yaeger and Satterthwaite lawsuits.

The court's conclusion is supported by two further considerations: (1) the parties' course of dealing and (2) the fact that other coverage provisions would be rendered illusory under Liberty's interpretation of the Professional Services Exclusion. First, as explained above, the court

---

the duty to indemnify is not necessarily limited to the factual allegations of the underlying complaint . . . . An insurer may rely on evidence outside of the complaint to ultimately prove it has no duty to indemnify." (citations omitted)). For example, it could have produced facts that emerged through the discovery process in the Satterthwaites' lawsuit that indicate that their injuries only arose from MBI's professional services, and that other allegations of general negligence were only applicable to other defendants. But it did not. Liberty argues that MBI failed to offer evidence that it performed a service that was not a professional service. *See* ECF No. 88 at 13–14 ("To defeat this Motion, MBI simply needed to identify, with evidentiary support, a service which MBI performed, for which MBI was sued, that was ***not*** a professional service."). But that is not MBI's burden. Rather, in order to avoid the duty to indemnify, the burden is on Liberty as both the insurer and the movant to show by undisputed fact that a claim against MBI arose from a service that was not a professional service. *See Butterfield*, 670 A.2d at 651–52. In short, Liberty has provided no evidence as to what work MBI *actually did* at the construction site, and has therefore failed to satisfy its burden.

[11] Prior to issuing the policy to MBI, Liberty's own underwriter Matthew Shumway recognized the risk that Liberty would be required to indemnify MBI for the kinds of claims alleged in the Satterthwaite suit. *See* ECF No. 131-1 at 9 ("We have several exclusion [*sic*] in place to ensure we do not pick up any construction or professional exposure. Finding that these exclusions may not be held up in certain jurisdictions if general negligence is alleged [*sic*]. We need to decide if this is something we want to stay on since we will be continually brought in on professional claims and could be left holding the bag.").

may look to the parties' course of dealing to interpret the meaning of a policy provision. *See Metal Marketplace*, 733 F. Supp. at 978–79. MBI provides evidence that Liberty previously covered similar claims under similar policies issued by Liberty to MBI, which also contained professional services exclusion provisions. *See* ECF No. 129-1 at 77–79.[12] Given this history of dealing between the parties, MBI could have reasonably expected that Liberty would cover the claims at issue here. *See Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (explaining that "Pennsylvania case law . . . dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured" and concluding that this principle applies even where the insured is a sophisticated buyer of insurance (citations omitted)).

Second, the court must avoid construing policy provisions so as to render illusory other provisions within the policy. *See Heller v. Pa. League of Cities & Mun.*, 32 A.3d 1213, 1223–26 (Pa. 2011); *see also Great N. Ins. Co. v. Greenwich Ins. Co.*, No. 05-635, 2008 WL 2048354, at *5 (W.D. Pa. May 12, 2008) ("[A]n insurer cannot avoid an illusory coverage problem by simply conceiving of a single hypothetical situation to which coverage would apply." (citation omitted)). Because the PCO coverage is part of MBI's GCL policy, the Exclusions also apply to and limit it. If the court were to adopt Liberty's interpretation of the Exclusions, it is hard to imagine what claims Liberty would *ever* be required to cover under MBI's PCO coverage.[13] Essentially, Liberty

---

[12] This case represents the first time during the multi-year relationship between the parties that Liberty has sought to disclaim coverage by filing a declaratory judgment action.

[13] MBI's PCO coverage provides coverage for "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' . . . ." ECF 66-1 at 8, 40. "Your work" is defined as "(1)Work or operations performed by you or on your behalf; and (2) Materials, parts, or equipment furnished in connection with such work or operations." *Id.* at 41. It includes, among other things, "[t]he providing of or failure to provide warnings or instructions." *Id.*

contends that all of MBI's work constitutes professional services, even though the PCO provisions explicitly provide coverage for injuries arising from MBI's "work." For example, the Satterthwaites alleged that MBI failed to provide adequate traffic signs and instructions. This falls squarely within the PCO provision's definition of "your work," which includes "[t]he providing of or failure to provide warnings or instructions." *See* ECF No. 66-1 at 41. Under Liberty's interpretation of the policies, however, these claims would be excluded from coverage. Liberty simply responds that "PCO coverage would still exist for other activities of MBI that are not professional services and subject to other terms and conditions of the policy." ECF No. 88 at 21. But it fails to provide even a single example of what those activities might be.

The Professional Services Exclusions, under Liberty's interpretation, also appear to sweep away most if not all of the CGL policy generally. Liberty, citing a Seventh Circuit case, contends that the CGL policy was meant to cover only incidents such as someone entering the insured's trailer at the construction site and slipping and falling or an employee leaving a coffee burner on that starts a fire. *See* ECF No. 68 at 23 (citing *Prisco Serena Sterm Architects, Ltd. v. Liberty Mut. Ins. Co.*, 126 F.3d 886, 893 (7th Cir. 1997)). The court is unpersuaded that MBI reasonably expected its CGL policy, with its $4 million coverage limit, to cover only such incidents. Rather, viewing the evidence in the light most favorable to the non-moving party, MBI likely foresaw that in fulfilling its Professional Services Agreement, it would be required to perform some activities that would fall outside of its Professional Services Coverage, such as the work outlined in the allegations above. Because Liberty's interpretation of the Professional Services Exclusion would effectively cause it to sweep up most or all of MBI's other coverage and thereby render it illusory, the court declines to enter summary judgment in Liberty's favor.

21

## CONCLUSION

For the foregoing reasons, Liberty's Motion for Partial Summary Judgment is DENIED.

DATED March 30, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge