FILED
2022 MAR 31 AM 11:31
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE CO., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL BAKER INTERNATIONAL, INC., <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY** <br><br> Case No. 2:19-cv-00881-JNP <br><br> District Judge Jill N. Parrish |

Plaintiff Liberty Mutual Fire Insurance Co. ("Liberty") filed this action seeking declaratory judgment that it need not provide coverage for two lawsuits brought against its insured, Michael Baker International, Inc. ("Michael Baker"). Before the court are three motions to exclude expert testimony. Liberty filed a motion to exclude expert testimony by David Frangiamore and Alan Bradshaw [ECF No. 199]. Michael Baker filed two motions to exclude expert testimony, one to exclude expert testimony by Lynn Davies [ECF No. 193] and the other to exclude expert testimony by Lola Hogan [ECF No. 194]. For the foregoing reasons, the court grants in part and denies in part each of the motions.

## BACKGROUND

The court recites the majority of the relevant facts in its memorandum decision and order denying Liberty's second motion for summary judgment. *See* ECF No. 241. Therefore, the court provides only a brief background on the claims and experts referred to in this motion.

Liberty's complaint lists three causes of action:

- Declaratory Judgment: "Liberty seeks a declaratory judgment that under the Policy there is no coverage afforded for or duty to defend MBI in the lawsuits" because MBI Inc. is not an insured under the Policy. ECF No. 2 ¶ 40.
- Declaratory Judgment: "Liberty seeks a declaratory judgment that under the Policy there is no coverage afforded for or duty to defend MBI Inc. in the lawsuits" because coverage is excluded under any or all of the Endorsements cited. *Id.* ¶ 47.
- Declaratory Judgment: "Liberty seeks a declaratory judgment that under the Policy there is no coverage afforded to MBI Inc. for punitive damages." *Id.* ¶ 53.

Michael Baker brings four counterclaims against Liberty:

- Breach of Contract: Liberty breached its duty to defend Michael Baker in the Satterthwaite action.
- Breach of Contract: Liberty failed to provide and pay for independent counsel to defend Michael Baker in the Satterthwaite action.
- Declaratory Judgment: Declaration that Liberty would be required to indemnify Michael Baker for any settlement or judgment in the Satterthwaite case. Because Michael Baker has now settled the Satterthwaite action, it intends to move for leave to restate this count as a breach of contract for Liberty's failure to indemnify Michael Baker for the settlement payout.
- Bad Faith: Liberty acted in bad faith in connection with the Yaeger and Satterthwaite matters.

Michael Baker hired two experts to provide testimony in its case. Michael Baker engaged David Frangiamore ("Frangiamore") to serve as a bad faith expert and to opine on insurance industry custom and practices. Frangiamore is trained as a lawyer and has many years of experience with insurance claims, including handling and supervising over 1,000 insurance claims. Frangiamore frequently appears as an expert in insurance disputes.

Michael Baker also hired Alan Bradshaw ("Bradshaw") to serve as an attorneys' fees expert and to opine on Michael Baker's decision to hire outside counsel. Bradshaw is also trained as an attorney and has practiced in the insurance coverage and claim handling arena for the past thirty-three years.

Liberty hired its own experts to rebut Michael Baker's experts. Liberty hired Lola Hogan ("Hogan") to respond to Frangiamore's testimony. Hogan plans to opine on interpretation of the Commercial General Liability ("CGL") policy and whether Liberty based its claim handling decisions on an appropriate investigation. Hogan has worked in the insurance claims industry for over thirty years. She has served in various management positions within the insurance claims industry and has also handled a broad range of high-exposure claims.

Liberty hired Lynn Davies ("Davies") to rebut Bradshaw's testimony. Davies has forty years of legal experience, mostly in Utah. He practices primarily in the area of personal injury defense. Over the course of his career, he has reviewed thousands of legal bills in cases involving personal injury defense and has often consulted or worked on high-exposure personal injury cases.

## LEGAL STANDARD

The court has a "gatekeeping obligation" to determine the admissibility of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Federal Rule of Evidence 702, "[a] two-part test applies to determine admissibility." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must "determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting FED. R. EVID. 702). "Second, the court 'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Conroy*, 707 F.3d at 1168 (citation omitted). "[T]he court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *Nacchio*, 555 F.3d at 1241. Indeed, "the testimony must be 'based upon sufficient facts or data' as well as 'the product of reliable principles and methods' and the expert must have 'applied the principles and

methods reliably to the facts of the case.'" *Id.* (quoting FED. R. EVID. 702). "The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy*, 707 F.3d at 1168.

That said, district courts have broad discretion in deciding whether to admit or exclude expert testimony, *see Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003), and should "liberally admit expert testimony," *Armstrong v. Sabin*, No. 2:20-cv-261, 2021 WL 1530213, at *1 (D. Utah Apr. 19, 2021); *see also Ruff v. Ensign-Bickford Indus., Inc.*, 171 F. Supp. 2d 1226, 1232 (D. Utah 2001) ("The gatekeeper inquiry under Rule 702 is ultimately a flexible determination, keeping in mind that rejection of expert testimony has been the exception rather than the rule."). Under Rule 702, "[t]he standard for reliability is 'not that high,'" *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (citation omitted), and, as long as the expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field'"—and the testimony is otherwise admissible—"it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1085 (D. Colo. 2006) (quoting *Kumho Tire*, 526 U.S. at 152). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

## ANALYSIS

Here, the parties do not dispute the qualifications of the opposing experts. Instead, the parties focus their arguments on the second prong under Rule 702—whether the proposed expert testimony is reliable, relevant, and will assist the trier of fact. The court considers the objections

to opinions by Frangiamore, Bradshaw, Davies, and Hogan, respectively. The court admits in part and excludes in part each expert's opinion.

## I.   FRANGIAMORE

Liberty objects to the opinions expressed by Frangiamore because, in Liberty's view, his opinions "offer impermissible legal conclusions, instruct the jury on what result to reach, and are based in large part on speculation and unproven assumptions." ECF No. 199, at 2. In addition to these general objections, Liberty also expresses several specific objections to particular statements by Frangiamore. Michael Baker responds that Frangiamore opines only on Liberty's compliance with insurance industry customs and practices. Michael Baker contends that these opinions could assist jurors, who are likely unfamiliar with insurance industry custom and practice.

The court first addresses a series of statements that Liberty claims constitute legal conclusions. The court then turns to Liberty's objections that Frangiamore intends to improperly instruct the jury and forms his opinions based on speculation.

### A.   *Legal Conclusions*

Federal Rule of Evidence 704 "allows an expert witness to testify in the form of an opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact." *A.E. ex rel. Evans v. Ind. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991). But "an expert may not state legal conclusions drawn by applying the law to the facts." *Id.*; *see also United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986) ("[Q]uestions of law are the subject of the court's instructions and not the subject of expert testimony."). Nevertheless, "an expert may refer to the law in expressing his or her opinion." *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (citation and alterations omitted).

"The distinction between permissible and impermissible expert testimony is not always obvious." *SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 1005 (N.D. Okla. 2017). Indeed, the Tenth Circuit states that experts "are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions." *United States v. Richter*, 796 F.3d 1173, 1196 (10th Cir. 2015). Thus, the court must navigate the thin line between permitting experts to explain "how the law applies to a certain set of facts" while prohibiting impermissible "legal conclusion." In the following subsections, the court endeavors to draw distinctions between permissible expert testimony and impermissible legal conclusions as to Frangiamore's opinions that (i) Liberty offered an illusory defense, (ii) Liberty failed to recognize a conflict of interest with Michael Baker, (iii) the timing of the declaratory judgment action was unreasonable, (iv) Liberty violated its own customs in its handling of Michael Baker's defense, and (v) the effect of the court's denial of Liberty's first motion for summary judgment.

### i.    Illusory Defense

Frangiamore intends to testify that "Liberty Mutual offered an illusory defense to MBI because it unilaterally asserted a right to disclaim coverage and seek reimbursement of defense costs paid in this action in whole or in part to the extent permitted by law." ECF No. 200-1, at 19 (citation omitted). Stating outright that Liberty offered an illusory defense clearly constitutes a prohibited legal conclusion.

But Frangiamore is not wholly prohibited from speaking to this subject. Frangiamore may instead offer his expert opinion on the underlying facts. For example, he can opine regarding insurance custom, including opinions such as "[i]f there is no potential duty to indemnify under the policy the insurer should deny coverage for the claim." *Id.* Frangiamore can also opine that, based on industry standards, it was "unreasonable" for Liberty to "not inform[] and not allow[]

MBI to conduct its own defense through independent counsel." *Id.* at 21; *see, e.g.*, *Kearney v. Auto-Owners Ins. Co.*, No. 8:06-cv-595, 2009 WL 3712343, at *10 (M.D. Fla. Nov. 5, 2009) (permitting experts to opine on "what ordinary and reasonable claims handling practices consist of and whether or not [an insurer] complied with those standards"). He simply cannot draw the legal conclusion for the jury that the defense qualified as illusory.

### ii.    Conflict of Interest

Liberty also objects to Frangiamore's intended testimony that

> Liberty Mutual violated insurance industry custom and practice when it failed to recognize that its reservation of rights to disclaim coverage based on the application of 'professional services' exclusions created a conflict of interest between Liberty Mutual and MBI, such that the conflict required that Liberty Mutual give MBI the opportunity to retain independent counsel of its own choice to defend it in the Satterthwaite lawsuit at Liberty Mutual's expense.

ECF No. 200-1, at 21.

Again, Frangiamore may not make legal conclusions about whether the relationship between Liberty and Michael Baker here gave rise to a legally cognizable conflict of interest, or whether the conflict of interest gave rise to a legal obligation on the part of Liberty to provide independent counsel. Frangiamore may, however, offer factual conclusions as to whether the scenario described would typically be considered a conflict of interest under insurance industry standards. He may further opine on the typical solutions that insurance companies employ when a conflict arises. *Id.* at 22 ("Under insurance industry custom and practice, the typical solution to this conflict situation is for the insurer to explain the conflict and offer to pay for independent counsel that the insured would select to defend itself."). In sum, Frangiamore should confine his testimony to how the underlying facts relate to industry custom, and refrain from reaching any legal conclusions. *See Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*, 343 F. Supp.

2d 989, 1015 (D. Kan. 2004) (allowing expert opinions "relating to insurance industry standards and practices and whether Liberty Mutual's conduct conformed to such standards").

Liberty further complains that Frangiamore fails to explain the methodology he used in determining that a conflict of interest existed between Liberty and Michael Baker. But contrary to Liberty's view, Frangiamore does explain how he identified a conflict of interest. Specifically, he used "insurance industry custom and practice" to analyze a situation where "there was a direct overlap between the liability issues . . . and the coverage issue." *Id.* at 21. In Frangiamore's opinion, "[u]nder insurance industry custom and practice, this creates a conflict of interest between the insured and the insurer." *Id.* Frangiamore further relies on his review of deposition testimony from Liberty employees "admit[ting] that there was a conflict of interest between Liberty Mutual and MBI at the time of the reservation of rights letters." *Id.* at 22. In relying on evidence from the case record as well as his experience with industry custom, Frangiamore relied on proper methodology in reaching his opinion.

### iii.     Timing of Declaratory Judgment

Frangiamore intends to testify that "Liberty Mutual unreasonably filed and pursued a declaratory relief lawsuit against MBI and the Satterthwaite plaintiffs while the underlying Satterthwaite lawsuit was pending, thereby unreasonably exposing its insured to more financial risk and liability thereby." *Id.* at 30. Liberty objects to two aspects of this testimony. First, it contends that whether Liberty was permitted to file a declaratory relief action while the underlying action was pending represents a legal question. Second, it contends that whether Liberty was permitted to name the injured parties in the declaratory relief action is similarly a purely legal question.

But Frangiamore never purports to claim that the law prohibited Liberty from filing a declaratory judgment action while the Satterthwaite action remained pending. Rather, Frangiamore focuses on the timing of the declaratory judgment action from the perspective of an industry insider. Specifically, he intends to testify that the industry standard is that "the insurer acts on the rights it has reserved once it has the information needed to do so." *Id.* He adds that "[i]f the insurer delays in exercising those rights and continues to defend, the insurer may inappropriately lead the insured to believe that full coverage will be available." *Id.* Frangiamore then applies that standard to the present facts and opines that Liberty acted unreasonably by initiating the declaratory judgment action after defending Michael Baker for over a year. *See, e.g.*, *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 928 (D. Colo. 2017) ("[The expert] may offer testimony articulating what he believes to be the relevant industry standards, and explaining—factually—how [the insurer's] conduct did or did not comport with those standards."). At bottom, none of these opinions indicate that the law prohibited Liberty from filing the declaratory judgment action.

Similarly, Frangiamore never states that Liberty was prohibited from naming the injured parties in the declaratory relief action. Rather, Frangiamore intends to elucidate for the jury why involving the injured parties in the declaratory judgment action could cause serious difficulties for Michael Baker, particularly by introducing discovery complications. Lawyerly considerations, like discovery issues, may not be immediately obvious to the jury. Accordingly, Frangiamore's testimony can assist the jury in understanding the legal complications that arise from naming the injured party in a declaratory judgment action without drawing any impermissible legal conclusions.

To be clear, Frangiamore cannot testify about whether the law permitted Liberty to file a declaratory action while an underlying lawsuit was pending. Nor may he testify about whether the

law permits joinder of a particular party to a lawsuit. But his report indicates that he intends to confine himself to whether and why such actions are considered typical or proper in the insurance industry. *O'Sullivan*, 233 F. Supp. 3d at 928 (ruling that expert could offer opinions on whether the insurer's conduct "differed, in factual terms, from the practices of other insurers"). Such opinions do not constitute legal conclusions and thus the court permits them.

     **iv.**    **Liberty's Own Customs**

Frangiamore also intends to opine that "Liberty Mutual violated its own standards and practices with respect to assuming the defense and settlement of prior claims on behalf of MBI in cases similar to the Satterthwaite claim, where there was uncertainty about whether the alleged conduct of MBI involved 'professional services.'" ECF No. 200-1, at 35. Liberty claims that this is a legal opinion because "[t]he crux of Mr. Frangiamore's opinion is that Liberty, by purportedly providing defense or indemnity to past claims, was required to also defend and indemnify the Satterthwaite claim." ECF No. 199, at 6. But Liberty mischaracterizes Frangiamore's statements. Frangiamore intends to opine on whether Liberty acted differently in this case than in prior cases where uncertainty existed about whether the conduct qualified as a professional service. Such a factual opinion is permissible.

Liberty further complains that Frangiamore engages in speculation by guessing why Liberty acted differently in this case. Michael Baker responds that Frangiamore does not offer an opinion as to why Liberty acted differently in the present action. Rather, Michael Baker contends, Frangiamore simply points to a few factors that differed from prior cases. An expert's opinion must be "based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590). Frangiamore's report identifies two "factors" that distinguish the Satterthwaite action from

previous actions where Liberty fully defended and settled on Michael Baker's behalf: (1) Michael Baker did not renew its policy with Liberty and (2) Liberty faced exposure up to the policy limit. To the extent that Frangiamore suggests that these represent the definite reasons why Liberty decided to act differently in this case, the court excludes the opinion as speculation. Frangiamore is not qualified as an expert on Liberty's internal decisionmaking process and, accordingly, any opinion on Liberty's internal decisionmaking process would constitute unsupported speculation. But to the extent that Frangiamore simply observes factual differences between the prior case and the present case, the court finds his opinion admissible. Therefore, Frangiamore should limit his testimony on this topic to observing differences between the Satterthwaite action and prior actions involving Liberty and Michael Baker. Frangiamore must refrain from drawing any conclusions as to whether those differences supply the definitive reason why Liberty acted differently in this instance.

### v.   Denial of First Summary Judgment Motion

During Frangiamore's deposition he offered several additional opinions. Specifically, Frangiamore indicated that he intends to testify that based on this court's prior ruling, Liberty is (i) required to withdraw its denial of coverage and reimburse its insured for fees and costs and pay its policy limits for its failure to settle the case; and (ii) Liberty should reopen its claim investigation to determine what additional harm or damage was caused to Michael Baker because Liberty breached its duty to defend.

Liberty objects to these additional opinions as inappropriate attempts to testify about the effect of this court's first summary judgment ruling. Michael Baker responds that Frangiamore limits his testimony to explaining the insurance industry custom of reviewing a coverage position based on new developments, such as the court's ruling.

As an initial matter, the court notes that Frangiamore mischaracterizes the court's decision as being "a dispositive ruling by the court on what the legal obligations are." ECF No. 200-2, at 4. The court has not ruled on Liberty's legal obligations in this case. Rather, the court simply held that a reasonable jury could find that Liberty owed Michael Baker coverage. It did not, however, make a dispositive ruling that Liberty did, in fact, owe Michael Baker coverage.

In addition to misreading this court's opinion, "an expert witness cannot state legal conclusions drawn by applying the law to facts." *United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979). Therefore, Frangiamore's opinion on Liberty's legal obligations under the court's prior order is inappropriate. And Frangiamore does not even attempt to couch this opinion in industry standards. Rather, he baldly states that because insurance companies must "follow the applicable law in the relevant jurisdiction" that Liberty should withdraw its denial of coverage, reimburse Michael Baker for fees and costs, and reopen its investigation to determine additional harm caused to Michael Baker. *Id.* The court will thus exclude the aforementioned opinions that Frangiamore offered in his deposition.

### B.    *Instructing the Jury*

Liberty next argues that Frangiamore intends to instruct the jury on how to apply the law to the facts or on what result the jury should reach. As an example, Liberty cites to Frangiamore's opinion that

> Liberty Mutual failed in its obligation to supervise its defense counsel and authorized and allowed the disclosure of an opinion that was disastrous for MBI, because it supported plaintiff's counsel's argument in the Satterthwaite case that MBI's conduct and work was primarily responsible for the accident. This resulted in increased financial exposure to MBI and made the subsequent negotiations by later retained personal counsel James Brogan and Heidi Goebel very difficult because Plaintiff['s] counsel could use MBI's own expert report against it at trial.

ECF No. 200-1, at 24-25. Frangiamore bases his opinion on the observation that "[i]nsurance industry custom and practice requires that an insurer review and supervise its retained counsel," which "includes

the obligation to review, evaluate and approve retention of any needed expert for the defense." *Id.* at 24.

It is unclear as to what underlying law Liberty believes that Frangiamore intends to instruct the jury. Indeed, Frangiamore does not state that Liberty had a legal obligation to supervise its defense counsel. Rather, Frangiamore opines on whether Liberty met the *industry standards* regarding supervision of hired counsel. As noted above, "[the expert] may offer testimony articulating what he believes to be the relevant industry standards, and explaining—factually—how [the insurer's] conduct did or did not comport with those standards." *O'Sullivan*, 233 F. Supp. 3d at 928. Because Frangiamore evaluates Liberty's actions in light of the industry standard, not the legal standard, the court finds his testimony admissible.

In a footnote, Liberty adds the following additional example of Frangiamore's allegedly improper jury instruction: "Liberty Mutual deprived MBI of the opportunity to respond to the settlement offers that were made by the plaintiff in the Satterwaite [sic] lawsuit, which is inconsistent with insurance industry custom and practice." ECF No. 200-1, at 25. Again, it is unclear to the court how this statement instructs the jury on how to apply the law to the facts. It simply reiterates the fact— well established in the record—that Liberty did not give Michael Baker the opportunity to respond to settlement offers in the Satterthwaite matter. Frangiamore notes that Liberty's action is inconsistent with industry standards but draws no conclusions on how the law would view it. Accordingly, the court finds this opinion admissible.

### C.  Basis for Frangiamore's Opinions

Liberty argues that Frangiamore's opinions are "riddled with speculation and unproven assumption." ECF No. 199, at 8. But Liberty provides only one example of the purportedly rampant speculation and unproven assumptions. Specifically, Liberty objects to the opinion that "[b]ased on the information disclosed in this coverage litigation, is it [sic] apparent that as of early

2019 Liberty Mutual had already internally concluded that there was no duty to defend or indemnify MBI for the Satterthwaite lawsuit" and that "[a]s a result, Liberty Mutual should have promptly denied coverage for the claim and allow[ed] MBI to conduct its own defense and settlement discussions." ECF No. 200-1, at 34. Liberty believes that the statement amounts to nothing more than speculation as to what the facts show.

But Frangiamore provides sufficient detail as to the underlying facts that led him to draw his conclusion. *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) ("[E]xpert opinions must be based on facts which enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required." (citation and alterations omitted)). For his conclusion that Liberty decided it had no duty to defend by early 2019, he cites to a roundtable between the Liberty adjuster and Liberty management in April 2019, where management confirmed no coverage for the Satterthwaite claims. And for his conclusion that Liberty should have allowed Michael Baker to conduct its own defense, Frangiamore cites to insurance industry custom and practice, which requires the insurer to undertake the defense of an insured only when it has the duty to do so. Because Frangiamore bases his opinions on facts contained in the record and his experience in the industry, the court rejects the position that Frangiamore's opinions constitute improper conjecture or speculation.

## II.    BRADSHAW

Liberty objects to portions of Bradshaw's testimony as (1) improper legal conclusions, (2) improper speculation, and (3) based on a lack of knowledge of the underlying facts. The court addresses each category, and any specific statements contained therein, in turn.

### A.   Legal Conclusions

Liberty argues that Bradshaw's first three opinions all constitute legal conclusions as to Liberty's responsibility for paying the Brogan/Goebel fees. Moreover, Liberty argues that Bradshaw's opinions include legal conclusions regarding attorneys' fees. The court addresses each of Liberty's concerns.

### i.   Entitlement to Additional Counsel

Liberty objects to the following three opinions from Bradshaw, which Liberty argues each go to whether Liberty was required to pay the Brogan/Goebel fees:

- "The first way in which the role of defense counsel was significantly limited is that there appears to be no evidence that Mr. Thompson ever obtained settlement authority from the general liability insurers, the professional liability insurers, or MBI." ECF No. 200-3, at 14-15.
- "The second way in which the scope of representation by Robert Thompson was significantly limited and in my opinion made it necessary to retain DLA Piper and Goebel Anderson in March 2020, is that Mr. Thompson was the only lawyer who provided substantial work on the case from SC&M and that Mr. Thompson was assisted by a paralegal." *Id.* at 15.
- "There also appears to have been significant scope limitation with respect to the expert witnesses available for MBI's defense. It is my opinion that the absence of expert testimony and the offering of expert opinion harmful to MBI negatively impacted the defense and increased the settlement and trial value of plaintiffs' claims against MBI, and this further necessitated retaining DLA Piper and Goebel Anderson." *Id.* at 17.

Liberty argues that the question of whether Michael Baker was entitled to additional legal counsel paid for by Liberty is a question of law, i.e., whether there was a conflict of interest. Accordingly, Liberty objects to any opinion by Bradshaw on that topic. But Bradshaw expresses no opinion as to whether Liberty should be responsible for paying the Brogan/Goebel fees. Rather, Bradshaw focuses on identifying "significant limitations that necessitated the retention of DLA Piper and Goebel Anderson as trial and settlement counsel." *Id.* at 14. Therefore, Bradshaw opines only that Michael Baker acted reasonably in retaining Brogan and Goebel. But Bradshaw never

states—nor even suggests—that these significant limitations represented conflicts of interest such that Liberty was required by law to pay for additional legal counsel. Bradshaw avoids any legal conclusions about Liberty's responsibility to pay for Brogan and Goebel and instead focuses his expert opinion on providing factual explanations regarding limitations to Thompson's defense. Accordingly, the court finds his opinion on this topic admissible.

### ii.       Attorneys' Fees

Liberty further contends that Bradshaw impermissibly opines on the effect of legal precedent on the question of attorneys' fees. Specifically, Liberty objects to Bradshaw's opinion "that MBI's payment of these legal bills to DLA Piper and Goebel Anderson demonstrates the reasonableness of the fees charged." ECF No. 200-3, at 18. Bradshaw points to four judicial opinions—all of which hold that marketplace rates are established by what clients actually pay and that insurance rates do not reflect the marketplace rate because of the volume of litigation insurers bring into a firm—as the basis for his opinion. But Bradshaw must testify as to his own opinions about attorneys' fees, not the opinions of various courts. *See Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("[A]n expert should not be allowed to instruct the jury . . . on the applicable law."); *Guy v. Ford Storage & Moving Co.*, No. 4:18-cv-216, 2020 WL 12309717, at *4 (S.D. Iowa Oct. 28, 2020) ("To the extent that [the expert's] testimony regurgitates the contents of federal regulations, it must be excluded. Only the Court may instruct the jury on the law."). Although Bradshaw states that his conclusion is based on "my opinion," he provides absolutely no basis— besides the caselaw—for forming that opinion.

Bradshaw may state his opinion about the reasonableness of Brogan and Goebel's fees, as long as he forms that opinion based on his expertise and a review of documents in the record. But Bradshaw may not testify that a fee is reasonable merely based on caselaw. Accordingly, the court

16

excludes Bradshaw's testimony on the topic of attorneys' fees to the extent that it relies solely on caselaw.

### B.    *Speculation*

Liberty objects to several of Bradshaw's opinions as speculative, including:

- "Although not expressly stated, it appears probable that the reason for the increase in the verdict numbers and the likelihood of a higher allocation was that the expert report of MBI's expert traffic control engineer had been provided to the parties." ECF No. 200-3, at 16.
- "It is my opinion that proceeding in this fashion without consulting with additional experts increased the value of the case to the plaintiffs and the likelihood of an adverse verdict against MBI." *Id.* at 17.
- "MBI, however, which is based in Pittsburgh, did not have the luxury as of March 2020 of surveying the local bar of Utah and identifying Utah trial counsel who could, on short notice, prepare for a very complicated trial or effectively settle the case." *Id.* at 18.

As noted above, "[a]n expert opinion must be based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation but absolute certainty is not required." *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation and alterations omitted).

In the first two opinions, Bradshaw simply applies his expertise to the facts to "help the trier of fact to understand the evidence." *Nat'l Indem. Co. v. Nelson, Chipman & Burt*, No. 2:07-cv-996, 2013 WL 12303337, at *1 (D. Utah Jan. 22, 2013) (citation omitted). The record clearly establishes that the value of the case increased. Bradshaw offers his opinion as to factors that may have contributed to that fact (i.e., the negative expert report and the lack of additional experts) based on evidence in the record. Although Bradshaw is not absolutely certain that those factors contributed to the increased value of the case, he grounds his opinions in sufficient fact to render them admissible.

The final opinion goes to why the DLA Piper fees were reasonable given the context. "[E]xpert testimony is admissible if it will simply assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context." *Allmond v. Akal Sec., Inc.*, No. 4:05-cv-96, 2007 WL 988757, at *3 (M.D. Ga. Mar. 29, 2007) (quoting 4 Joseph M. McLaughlin et al., *Weinstein's Federal Evidence* § 702.03[1] (2d ed. 2007)). Bradshaw's opinion may aid jurors unfamiliar with the challenges involved in retaining counsel in a foreign jurisdiction in understanding why Michael Baker elected to use an out-of-town lawyer with a higher fee arrangement. Bradshaw, of course, cannot testify to what Michael Baker was actually thinking when it decided to forego Utah counsel. But Bradshaw's expert opinion helps jurors understand the context in which that decision was made.

In sum, the court finds that Bradshaw relied on record evidence to form his opinions regarding factors that contributed to the increased value of the case. And Bradshaw's explanation of the difficulties in retaining counsel in a foreign jurisdiction provides useful context to jurors. Accordingly, the court finds all three opinions admissible.

### C.    *Barnes & Thornburg Fees*

Finally, Liberty argues that the court should exclude Bradshaw's opinion as to the reasonableness of the Barnes & Thornburg fees because Bradshaw stated in his deposition that he could not remember if he had seen the unredacted version of the bills from Barnes & Thornburg. Without the underlying billing entries, Liberty argues, Bradshaw's opinion that Barnes & Thornburg's fees are reasonable has no basis in evidence. Michael Baker replies that the court should reserve decision on Bradshaw's opinion as to the reasonableness of the Barnes & Thornburg fees until the post-trial motion when Michael Baker seeks those fees.

Based on Michael Baker's representations that it will not utilize any of Bradshaw's opinions about the Barnes & Thornburg fees at trial, the court defers consideration of this aspect of Bradshaw's testimony to the post-trial motion for attorneys' fees.

## III.   DAVIES

Michael Baker objects to limited portions of Davies' testimony. Specifically, Michael Baker contends that the court should exclude two of Davies' opinions: his opinions regarding (1) Michael Baker's reasoning for retaining Goebel and Brogan and (2) the reasonableness of Goebel's fees.

### A.   *Reasons for Retaining Brogan and Goebel*

Michael Baker objects to Davies' opinion that Michael Baker's general counsel, Ed Gentilcore's ("Gentilcore"), stated reason for retaining Brogan "does not appear to be legitimate or have a basis in fact" and that Gentilcore's stated reason for retaining Goebel is "inexplicable." *See* ECF No. 197-5, at 34, 39; ECF No. 212-1, at 15. Michael Baker argues that these opinions consist of improper speculation and go to Gentilcore's credibility. *See United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2011) ("[T]he credibility of witnesses is generally not an appropriate subject for expert testimony." (citation omitted)).

Far from speculation, Davies draws his opinion that Gentilcore's decision does not have a basis in fact from the evidence provided in the record. Davies read the reasons provided by Michael Baker, considered all of the evidence in the record, and concluded that the reasons did not—in his expert opinion—make sense. Indeed, even if considerable evidence in the record contradicted Davies' underlying assumptions, Davies' testimony is still admissible where "his assumptions [are] not without support" in the record. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1524 (10th Cir. 1984). The concerns raised by Michael Baker are best addressed through

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *see also Kehler v. Bridgestone Am. Tire Operations, LLC*, No. 15-cv-127, 2016 WL 8316772, at *7 (D. Wyo. Dec. 1, 2016) ("The issues raised by Plaintiff are best addressed through vigorous cross examination, rebuttal expert testimony, and presentation of contrary evidence whereby the trier of fact will determine what weight, if any, should be attributed to expert opinions.").

Moreover, Davies' basic opinion—that Gentilcore did not ground his decision in fact— does not go to Gentilcore's credibility. Rather, Davies simply opines on whether the reasoning stated by Gentilcore makes sense given the factual context. Moreover, Michael Baker intends to offer its own witness to explain why Gentilcore's reasoning made sense given the factual context. In the face of competing experts, the court will allow the jury to hear both and make its own determination about the proper weight to give each expert's testimony. *See Heer v. Costco Wholesale Corp.*, 589 F. App'x. 854, 862 (10th Cir. 2014) (unpublished) ("At the Rule 702 gatekeeping stage, district courts must avoid weighing the credibility or persuasiveness of the competing experts' ultimate conclusions."); *James v. United States*, No. SA-12-CA-800, 2013 WL 12106710, at *2 (W.D. Tex. June 24, 2013) ("In a battle of competing experts, it is not the role of the Court upon a motion for summary judgment to pick between these experts or to pre-try the case.").

But while Davies may opine that the reasons for retaining Goebel and Brogan do not, in his opinion, have a basis in fact, the court cautions Davies to avoid any characterization that suggests an improper motive on the part of Gentilcore. Courts routinely exclude expert testimony as to intent, motive, or state of mind as impermissible. *See, e.g.*, *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("[H]e could not testify *as an expert* that GM had a particular

motive."); *Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-939, 2012 WL 5451816, at *2 (E.D. Cal. Nov. 7, 2012) ("The court finds this and other testimony regarding Defendant's intent, motives or state of mind to be impermissible and outside the scope of expert testimony."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp 2d 164, 192 (S.D.N.Y. 2009) (excluding expert testimony "as to the knowledge, motivations, intent, state of mind, or purposes of [defendant], its employees, the FDA, or FDA officials"). Specifically, the court excludes any statement that Gentilcore's reasons were not "legitimate" because Davies' use of the word "legitimate" raises the inference that the reasons were illegitimate, i.e., that they were lies or misrepresentations. Suggesting that Gentilcore lied goes to his intent or state of mind, both of which represent improper topics for expert testimony.

Accordingly, Davies may testify that Gentilcore's stated reasons for retaining Brogan "do[] not appear to . . . to have a basis in fact." ECF No. 197-5, at 34. But Davies must refrain from suggesting that Gentilcore's stated reasons are illegitimate or offering any other opinion that implicates Gentilcore's state of mind.

### B.    *Reasonableness of Goebel's Fees*

Michael Baker further argues that Davies' opinions regarding Goebel's fees are pure speculation. Specifically, Michael Baker takes issue with Davies' use of the word "premium." Michael Baker argues that without knowledge of the rates that Goebel usually charges, Davies cannot infer that Goebel charged a "premium" in this case.

But Michael Baker misunderstands Davies' use of the word "premium." Michael Baker understands it to mean that Goebel's charges were unreasonable as compared to what she charges other clients. Davies is not an expert on what Goebel typically charges clients and cannot offer an opinion on that topic. But Davies is an expert on the typical billing rates for insurance defense

21

attorneys. Therefore, Davies can speak to whether Goebel's fees aligned with industry standards. Thus, Davies' use of the word "premium" simply refers to how Goebel's rates compare to the industry standard, not to the typical rates charged by Goebel. *See King v. GEICO Indem. Co.*, 712 F. App'x 649, 651 (9th Cir. 2017) (unpublished) ("[E]xperts may testify about industry standards . . . ."). Therefore, Davies may testify that Goebel charged a premium, meaning that her rates were out of line with industry standards in Davies' opinion. If Michael Baker wishes to clarify Davies' use of "premium," it may do so through cross-examination.

## IV.   HOGAN

Michael Baker objects to Hogan's opinions for two reasons. First, Michael Baker argues that Hogan's testimony offers legal conclusions about how to interpret the CGL policy that Michael Baker had with Liberty. Second, Michael Baker argues that Hogan engages in pure speculation in opining that Liberty conducted a reasonable investigation and reached a reasonable coverage determination. The court addresses each objection in turn.

### A.   *Hogan's Interpretation of the CGL*

Michael Baker objects to Hogan's testimony to the extent it provides legal conclusions about the interpretation of the Liberty policy and its application to the Satterthwaite claim. Specifically, Michael Baker objects to the following opinions in its motion:

- "MBI contends that some of the allegations are covered by the Products and Completed Operations (PCO) coverage. I do not agree." ECF No. 222-1, at 13.
- "MBI's 'work' meets none of the criteria" in the definition of PCO coverage. *Id.* at 15.
- "Liberty correctly asserted all three exclusions. Based on the investigation, each of the three asserted exclusions would have precluded coverage on its own." *Id.* at 18.
- "MBI contends that the bodily injury and property damages claimed in *Satterthwaite* are covered under the CGL policy. I do not agree." *Id.* at 15.

22

Michael Baker includes additional objectionable statements in its index of opinions to exclude. *Id.* at 2-3. Liberty responds that Hogan intends to testify regarding industry standards—a regularly admitted topic for expert opinion—and to testify regarding an ambiguous contractual provision.

"An expert may not state legal conclusions drawn by applying the law to the facts." *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (citation omitted). Of course, "[t]he line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). But, ultimately, the expert's testimony must "assist[], rather than supplant[], the jury's judgment." *United States v. Dazey*, 403 F.3d 1147, 1172 (10th Cir. 2005). Here, however, Hogan repeatedly engages in legal analysis and draws legal conclusions. In a declaratory judgment action such as this one, the critical question is whether any of the policy exceptions apply to exclude coverage. Hogan repeatedly and blatantly draws conclusions on that exact topic. For instance, she opines that "each of the three asserted exclusions would have precluded coverage on its own" and that the CGL policy provided no coverage for bodily injury and property damages claims in *Satterthwaite*. ECF No. 222-1, at 18. These sorts of conclusions do the work of the court by directly answering the fundamental legal question that underlies the declaratory judgment claim here. In sum, whether there is coverage is a legal question to be determined by the court, not the expert witness.

Moreover, Hogan engages in drawing legal conclusions on the subject of whether Liberty acted in bad faith. For instance, she opines that Liberty's investigation "was done in good faith" and that "[t]he claim was managed properly and in good faith." *Id.* at 20, 22. Again, whether Liberty acted in good faith is the critical question underlying Michael Baker's bad faith counterclaim. The jury—not Liberty's expert—must determine whether Liberty acted in good faith.

To the extent Hogan has opinions about common industry understandings or whether Liberty's actions comported with industry standards, the court will permit those opinions. For instance, the court finds admissible Hogan's opinions that "'[p]rofessional services' is commonly understood in the industry to mean a service requiring specialized knowledge and skill usually of a mental or intellectual nature and usually requiring a license, certification, or registration,"[1] or her opinion that Liberty's decision to continue to defend Michael Baker but not contribute to the settlement was "consistent with the custom and practice in the industry." *Id.* at 18-19. But it is the province of the court—not the expert witness—to instruct the jury on the law, including the proper legal interpretation of a contract. *See iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*, No. 2:09-cv-205, 2012 WL 3067597, at *2 (D. Utah July 27, 2012) ("[A]n expert's opinion testimony cannot 'merely tell the jury what result to reach.'" (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988)).

Accordingly, Hogan may testify to Liberty's compliance with industry standards, but she may not testify to legal conclusions such as whether a policy exclusion applies here or whether Liberty acted in bad faith.

### B. Reasonableness of Liberty's Investigation and Coverage Determination

Finally, Michael Baker objects to Hogan's opinion that Liberty's investigation and coverage determination was reasonable. Specifically, Michael Baker objects that Hogan cannot

---

[1] Michael Baker notes that Hogan appears to cite to Merriam Webster for this proposition. To the extent that this opinion is not based on Hogan's expertise, it is inadmissible. *See Kelly v. Enbridge (U.S.) Inc.*, No. 07-3245, 2008 WL 2078069 at *1 (C.D. Ill. May 15, 2008) ("[The expert's] discussion of dictionary meanings of a word is not based on his expertise and is not proper expert testimony."). But given the ambiguity in her report, Hogan's bases for her opinion is a topic better explored on cross-examination at trial. *See Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

opine on that topic because she openly admitted that she does not know what Liberty's coverage investigation consisted of, nor on what bases Liberty decided to deny coverage. Moreover, Hogan admitted that she has not seen Liberty's coverage file on the Satterthwaite action. Therefore, in Michael Baker's view, Hogan has no foundation for her opinions on this topic.

But "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *see also Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) ("[T]o the extent the lack of firsthand experience by either expert is relevant, it goes . . . to the weight and not the admissibility of the testimony."). Therefore, whether Hogan had a sufficient basis for deciding that Liberty made a reasonable coverage determination is best explored on cross-examination. For instance, Michael Baker may inquire into whether Hogan had ever seen the coverage file or any other components of Liberty's investigation. And the jury, based on the information that comes out on cross-examination, can determine what weight to give her opinion.

*          *          *

The court's opinion here addresses only the issues briefed by the parties. But every piece of evidence, expert or otherwise, must also comport with Federal Rules of Evidence 402 and 403. Rule 402 states that "[i]rrelevant evidence is not admissible." Rule 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . undue delay [or] wasting time." Indeed, Rule 702(a) contains a corollary requirement that the expert testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." While the parties engage in extensive briefing regarding the admissibility of the opposing party's expert reports, they spend very little time discussing the threshold consideration of how the experts' opinions relate to particular claims or counterclaims.

Collectively, the parties bring three different types of claims or counterclaims in this case: declaratory judgment, breach of contract, and bad faith. The parties provide very little detail as to how exactly they intend to employ the expert testimony in their cases. Specifically, they fail to explain what evidence will apply to which particular claims or counterclaims.

Two of the categories of claims—declaratory judgment and breach of contract—largely turn on a question of law as to contract interpretation. 28 U.S.C. § 2201(a) permits a court to "declare the rights and other legal relations of any interested party seeking such declaration." In order to rule on both parties' declaratory judgment claims, the court must resolve the legal question of how to interpret the contract between the parties, and, specifically, whether the contract provides for coverage (or excludes coverage) of the Satterthwaite lawsuit. Resolution of the breach of contract counterclaims will largely turn on the court's interpretation of the parties' contract in resolving the declaratory judgment issue. Moreover, under Pennsylvania law, "[t]he task of interpreting a contract is generally performed by a court rather than by a jury." *Standard Venetian Blind Co. v. Am. Empire Ins.*, 469 A.2d 563, 566 (Pa. 1983); *see also D'Adamo v. Erie Ins. Exch.*, 4 A.3d 1090, 1096 (Pa. Super. Ct. 2010) ("The interpretation of an insurance contract is a matter of law and is generally performed by a court."). At bottom, then, both the declaratory judgment claim and counterclaim as well as the breach of contract counterclaims turn on legal interpretation of a contract between the parties.

But "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Pioneer Centres Holding Co. Emp'e Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017) (citation omitted). Nevertheless, Pennsylvania law states that "custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any

obvious ambiguity in the words of the contract." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) (permitting evidence of industry custom in interpreting a commercial general liability contract). Accordingly, the court will consider expert testimony as to industry custom for the limited purpose of understanding whether any specific words in the contract "mean something in the insurance industry which is different from the common meaning of the terms."[2] *Id.* But the court will not entertain expert testimony that usurps the court's responsibility of interpreting the contract.[3]

Michael Baker also brings a bad faith counterclaim. The court finds that industry custom and practice may be relevant to the jury in resolving Michael Baker's bad faith counterclaim. *See, e.g.*, *Ford v. Allied Mut. Ins. Co.*, 72 F.3d 836, 841 (10th Cir. 1996) (permitting expert testimony on industry custom and practice on bad faith claim, not contract liability); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) (approving of expert that testified as to whether Defendants failed to comport with industry standards to assist jury in evaluating bad

---

[2] While the court is bound by Pennsylvania law, the court expresses two concerns reflected in Justice Saylor's dissent to *Sunbeam Corp. v. Liberty Mutual Insurance Co.* First, contract principles establish that court should interpret an insurance policy according to its plain and ordinary meaning. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999) ("Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense."). And a court should resort to extrinsic evidence only where the policy language is ambiguous. *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) (barring ambiguity, "intent is to be discovered only from the express language of the agreement"). The *Sunbeam* court's acceptance of extrinsic industry custom evidence without a showing of ambiguity appears to run contrary to long-established contract principles. Second, the court disagrees with admitting evidence of industry custom in order to interpret a terms of a commercial general liability policy offered to a "widely diverse business public." *See Sunbeam*, 781 A.2d at 1196 (Saylor, J., dissenting). Here, the contract does not represent "a document negotiated between participants in some particular trade or industry" but rather a contract where one party is an insurance company with deep knowledge of industry custom and practice and the other party is a construction company with no background in the insurance industry. Nevertheless, because Pennsylvania law applies to this dispute, the court will consider industry custom and usage as outlined above.

[3] As noted above, the court will not allow Hogan's repeated attempts to interpret the contract for the court.

faith claim); *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 382 (Pa. Super. Ct. 2002) (holding that "the admission or exclusion of expert testimony in actions on insurance policies based on a claim of bad faith remain a matter within the sound discretion of the trial court"); *Bergman v. United Servs. Auto. Ass'n*, 742 A.2d 1101, 1107 (Pa. Super. Ct. 1999) ("[T]here may be bad faith cases in which expert testimony might be helpful."). Without the context of trial, the court cannot make particular determinations as to which specific opinions are relevant. Accordingly, the court leaves for later consideration the issue of whether the expert testimony referenced above with the relevance standards set out in Rules 402, 403, and 702 for purposes of Michael Baker's bad faith counterclaim. To the extent the experts' opinions on custom and practice in the industry are relevant and helpful to resolving the bad faith claim, the court will permit those opinions.

Finally, the court cautions the parties that, under Rule 702, "the 'touchstone' of admissibility is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991) (citation omitted). And where "expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible." *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994).

## CONCLUSION AND ORDER

The court GRANTS IN PART and DENIES IN PART each motion to exclude. The parties must limit their expert testimony in accordance with the opinion laid out above.

DATED March 31, 2022

BY THE COURT

Jill N. Parrish
United States District Court Judge