IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE,<br><br>Plaintiff,<br>v.<br><br>MICHAEL BAKER INTERNATIONAL, INC.; JOELLE SATTERTHWAITE; JACKSON SATTERTHWAITE; and AUDREY J. YAEGER,<br><br>Defendant. | **AMENDED MEMORANDUM DECISION AND ORDER DENYING MICHAEL BAKER INTERNATIONAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00881-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Before the court is a motion for partial summary judgment filed by Defendant and Counter-Claimant Michael Baker International, Inc. ("MBI"). MBI seeks a declaratory judgment that Plaintiff Liberty Mutual Fire Insurance ("Liberty") must provide indemnification for losses MBI incurred due to its settlement of the personal injury litigation underlying this dispute (the "Satterthwaite litigation"). The court held oral argument on the motion on December 8, 2022. At the conclusion of that hearing, the court took the motion under advisement. After considering the parties' written submissions and the arguments presented at hearing, the court DENIES partial summary judgment.

## FACTUAL BACKGROUND

### I.      THE CRASH

This case arises out of a claim brought by JoElle Satterthwaite ("Satterthwaite") against MBI for personal injuries that she and her son (collectively, "the Satterthwaites") suffered in a construction zone due to MBI's negligence.

MBI is an engineering firm that specializes in resolving complex infrastructure challenges. In April 2017, MBI entered into a Professional Services Agreement ("PSA") with contractor RLW/Clyde. Under the PSA, MBI agreed to provide engineering and other design services in connection with the construction of four interchanges on Bangerter Highway. The interchanges are located at the intersection of 11400 South and Bangerter Highway in South Jordan, Utah.

On January 25, 2018, Satterthwaite drove northbound on Bangerter Highway with her son, Jackson Satterthwaite, who was unsecured in the backseat. She turned left onto 11400 South. As Satterthwaite turned across the southbound lanes of Bangerter Highway, a speeding motorist struck her vehicle. The impact of the collision wounded Satterthwaite and ejected her son from the vehicle, causing permanent life-altering injuries.

Soon thereafter, the Satterthwaites filed suit in state court against MBI and several other defendants responsible for the construction of the interchange. They asserted a single cause of action for negligence and alleged that the defendants had breached their duty of care in several ways, including, without limitation:

a. By failing to provide adequate signs, instructions, and traffic-control devices informing motorists that left-hand turns were no longer allowed;
b. By failing to provide a traffic-control light on the west side of the large, east-west gap before motorists entered southbound traffic;
c. By failing to remedy a defective, unsafe, and/or dangerous condition at the Intersection;
d. By failing to comply with applicable standards, codes, and regulations for traffic control and signage at the Intersection;
e. By failing to properly hire, train, retain, and/or supervise personnel working on the Construction Project;
f. By failing to comply with the applicable traffic-control plan for the Intersection;
g. By implementing and/or approving a defective traffic-control plan for the Intersection;
h. By failing to have law enforcement personnel regulating traffic at the Intersection at the time of the incident;
i. By failing to allow sufficient timing for motorists to get across the large, east-west gap before entering southbound traffic;
j. By creating a defective, unsafe, and/or dangerous condition at the Intersection; and/or

2

      k.   Any other acts and/or omissions that may later be discovered.

ECF No. 2-1 at 6. The Satterthwaite's complaint did not attribute specific acts to any individual

defendant, but rather characterized all tortious conduct as the defendants' collective responsibility.

*Id*. at 5-7.

## II.    MBI'S INSURANCE POLICIES

At the time of the crash on Bangerter Highway, MBI held a Commercial General Liability

("CGL") policy issued by Liberty.[1] The CGL policy provided in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as
> damages because of "bodily injury" or "property damage" to which this insurance
> applies. We will have the right and duty to defend the insured against any "suit"
> seeking those damages. However, we will have no duty to defend the insured
> against any "suit" seeking damages for "bodily injury" or "property damage" to
> which this insurance does not apply.

ECF No. 66-1 at 26. The CGL policy included a "General Aggregate Coverage Limit" of

$4,000,000, an "Each Occurrence Limit" of $2,000,000, and a $250,000 deductible. *Id.* at 8; ECF No.

241 at 6. It also contained amendatory endorsements titled "Exclusion—Designated Professional

Services" and "Exclusion—Engineers, Architects or Surveyors Professional Liability"

(collectively, the "Professional Services Exclusions"). The Professional Services Exclusions

provide:

### Endorsement CG 21 16 04 13 (EXCLUSION – DESIGNATED PROFESSIONAL SERVICES)

> With respect to any professional services shown in the Schedule, the following
> exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily
> Injury and Property Damage Liability** and Paragraph **2. Exclusions** of **Section
> I – Coverage B – Personal And Advertising Injury Liability:**

> This insurance does not apply to "bodily injury", "property damage" or "personal
> and advertising injury" due to the rendering of or failure to render any professional
> service.

---

[1] Policy No. TB2-681-001415-717, valid from August 30, 2017 to August 30, 2018.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

## SCHEDULE

**Description Of Professional Services:**

All professional services performed by or on behalf of the named insured.

. . .

### Endorsement CG 22 43 04 13 (EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY)

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

ECF No. 66-1 at 157, 163.

As part of the CGL policy, the parties agreed to a coverage limit of $4,000,000 for "Products-Completed Operations" ("PCO"). *Id*. at 8. The PCO coverage provides coverage for "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'" *Id*. at 40. "Your work" is defined as "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts, or equipment furnished in connection with such work or operations." *Id*. at 41. "Your work" includes, among other things, "[t]he providing of or failure to provide warnings or instructions." *Id*.

The PSA for the Bangerter Highway project also required MBI to obtain "Professional Errors and Omission Liability Insurance," which would "cover the negligent acts, errors, and omissions of the insured that provides professional services from [sic] the project." ECF No. 81-2 at 66. Accordingly, MBI contracted with Lloyd's Syndicate No. 2623 ("Lloyd's") to obtain Architects and Engineers Professional Liability and Architects, Engineers and Contractors Pollution Liability coverage with an aggregate limit of $15,000,000. ECF No. 81-2 at 69.

## III.  DEFENSE OF THE SATTERTHWAITE ACTION

In a letter dated December 13, 2018, Liberty informed MBI that it would "provide a defense to MBI for the [Satterthwaite] Lawsuit, subject to the following reservation of rights." ECF No. 88-1 at 2. Liberty reserved the right to "disclaim insurance coverage, in whole or in part, at a later date as warranted" and stated that "indemnification may not be available for the relief sought in the Lawsuit." *Id*. The letter outlined the Professional Services Exclusions in the policy, among other exclusions, as the grounds for Liberty's reservation. *Id*. at 4.

To effectuate its promise to defend, Liberty hired one of its panel lawyers to represent MBI—Robert Thompson ("Thompson") of Snow, Christensen & Martineau. Prior to this engagement, Liberty and Thompson maintained a longstanding working relationship—Liberty had

hired Thompson on several occasions prior to the Satterthwaite action. Thompson represented MBI through the full length of the litigation.

During its engagement with Thompson, MBI developed serious reservations about its newly assigned attorney's loyalty and effectiveness. Specifically, MBI was concerned (1) that Liberty had impeded Thompson's efforts to resolve the Satterthwaite matter by failing to give him necessary settlement authority or adequate resources to defend the case, (2) that Thompson had engaged an expert whose opinions were critical of MBI's work, and (3) that Liberty's denial of any duty to indemnify MBI created a conflict of interest necessitating independent counsel. Additionally, MBI worried that Thompson had never tried a similarly serious case involving severe injuries to a child. In light of its misgivings, MBI engaged James Brogan of DLA Piper to lead its defense in the Satterthwaite action. On Brogan's recommendation, MBI also hired Heidi Goebel of Goebel Anderson.

In July of 2020, MBI and the Satterthwaites reached a settlement agreement for an amount in excess of the Liberty policy limit. MBI informed Liberty of the settlement negotiations, however, Liberty declined to provide settlement authority even as it did not explicitly object to the settlement. Shortly thereafter, reflecting this settlement, the Third Judicial District Court dismissed the Satterthwaite litigation with prejudice as to MBI. Liberty refused to contribute any amount to the settlement, partially due to the fact that it had already filed this coverage action on November 8, 2019. ECF No. 2.

On June 30, 2020, Liberty filed a motion for partial summary judgment seeking a declaration that the Professional Services Exclusions at issue in this motion foreclosed indemnity for MBI. ECF No. 65. On March 30, 2021, the court denied this motion, holding that the Exclusions were ambiguous. ECF No. 157. On July 19, 2021, Liberty filed a second motion for summary judgment on MBI's counterclaims for damages suffered as a result of the underlying lawsuit and Liberty's conduct in denying its duty to indemnify. ECF No. 179. The court also denied this motion. ECF No. 241. Finally,

on April 25, 2022, MBI filed this motion for partial summary judgment, seeking a declaratory judgment that Liberty had a duty to indemnify MBI under the CGL policy. ECF No. 252.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Instead, the court must "view all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (citation and alteration omitted). Moreover, under Pennsylvania law it is well-established that the interpretation of an insurance policy is a matter of law that may be properly resolved at summary judgment.[2] *Nationwide Mut. Ins. Co. v. Nixon*, 682 A.2d 1310, 1313 (Pa. Super. Ct. 1996).

---

[2] In its memorandum decision regarding Liberty's first motion for summary judgment, the court decided that Pennsylvania substantive law applies in this action under Utah's choice-of-law rules. *See* ECF No. 157 at 9-10. The parties do not dispute this conclusion in their briefing.

## ANALYSIS

MBI's motion for partial summary judgement rests on two core contentions. First, MBI maintains that when insurance coverage depends on facts that were at issue in an underlying case that has been settled, the court in the coverage case may not look beyond the facts of the underlying complaint to find that indemnification is not warranted. Second, MBI argues that, if this principle is applied, the court must grant summary judgment in its favor because the Satterthwaite's complaint alleged that MBI negligently performed tasks that fall outside the scope of Liberty's Professional Services Exclusions.

The court first resolves MBI's evidentiary objections to Liberty's statement of additional facts. It then examines the two main substantive arguments in MBI's motion. After finding that it may review evidence outside of the four corners of the Satterthwaite complaint, the court ultimately decides that there is a genuine dispute of material fact as to whether MBI's actions are covered by Liberty's Professional Services Exclusions. As such, it denies MBI's motion for partial summary judgment.

## I.   EVIDENTIARY DISPUTES

To oppose a motion for summary judgment on factual grounds, a non-moving party is required to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). While "evidence need not be submitted in a form that would be admissible at trial . . . the content or substance of the evidence must be admissible." *Argo v. Blue Cross & Blue Shield, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quotations marks omitted).

MBI advances two sets of evidentiary objections to Liberty's statement of additional facts. First, it argues that Liberty cites to inadmissible settlement communications, negotiations, and

offers related to the present litigation in violation of FED. R. EVID. 408 ("Rule 408"). This objection is overruled. Second, it claims that Liberty cites to several pieces of inadmissible hearsay evidence in violation of FED. R. EVID. 802 ("Rule 802"). The court does not take up these objections because it does not need to rely on this evidence to determine the outcome of MBI's motion for partial summary judgment.

In its statement of additional facts, Liberty recounts several communications between MBI and Liberty regarding MBI's settlement of the Satterthwaite litigation. MBI argues that these facts, numbered 80-92, are inadmissible because they violate Rule 408.

Rule 408 states that evidence of "furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim" and "conduct or a statement made during compromise negotiations about the claim" are "not admissible . . . either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." FED. R. EVID. 408. While Rule 408 is broad, it does not completely bar all evidence of settlement negotiations. The court may still admit settlement negotiation evidence for purposes other than proving the validity or amount of a claim, "such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED. R. EVID. 408(b). Ultimately, the Rule should be read in light of its purpose, which "is to encourage settlements which would be discouraged if such evidence were admissible." FED. R. EVID. 408, advisory committee's notes, Senate Report No. 93–1277; *see Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1362-63 (10th Cir. 1987).

The court must first decide whether Rule 408 applies to the settlement negotiations in the underlying Satterthwaite litigation, rather than applying solely to settlement negotiations regarding

the current coverage case. *See Bradbury*, 815 F.2d at 1363. "Rule 408 is limited in its application to evidence concerning the settlement or compromise of 'a claim' when such evidence is offered to prove liability or validity of '*the* claim' or its amount." *Id*. Because the disputed settlement communications were not produced as part of a settlement of the specific claim at issue in the current litigation, Rule 408 might not apply because "read literally," it "does not appear to cover compromises and compromise offers that do not involve the dispute that is the subject of th[is] suit, even if one of the parties to the suit was also a party to the compromise." *Id*. Yet, the Tenth Circuit has adopted a broad reading of Rule 408, holding that the Rule applies to evidence of settlement negotiations as long as the settlement concerns "related cases." *Bradbury*, 815 F.2d at 1363 (ruling that settlement claims that arguably arose out of different events and transactions were "related" to the case at hand and, thus, covered by Rule 408, because they arose out of the same mining project.); *Ostrow v. GlobeCast Am. Inc.*, 825 F.Supp.2d 1267, 1273 (S.D. Fla. 2011) (explaining that "the farthest known expansion of Rule 408 occurred in *Bradbury*.").

Here, the underlying case and the coverage case are undoubtedly related. After all, the foundational argument of this motion for summary judgment is that the outcome of the underlying case dictates the outcome of the present case. A finding that Rule 408 applies here accords with the Rule's policy rationale. The purpose of Rule 408 is to encourage litigants to honestly and openly negotiate settlement of their claims without fear that their words may be turned against them during coverage litigation. Excluding negotiation evidence in an underlying tort action incentivizes just this behavior.

But even if Rule 408 applies to the settlement in the Satterthwaite case, the court still must determine whether it can allow Liberty's evidence under the exception covering evidence offered "for another purpose" besides proving "liability for or invalidity of the claim or its amount." FED.

R. Evid. 408(b). Here, Liberty uses the contested settlement evidence to support its argument that evidence outside of the four corners of the Satterthwaite complaint ought to be allowed because MBI cut Liberty out of the settlement process.[3] Additionally, Liberty uses negotiation evidence to argue that the court should deny summary judgment because MBI's settlement of the underlying action was a voluntary payment in violation of the CGL policy. *Id*. at 38-39.

Liberty's use of negotiation evidence to support its motion is acceptable. Liberty does not offer this evidence to prove to truth of the underlying facts that would shield it from liability. Instead, it uses settlement negotiations merely to argue that the court should allow it to introduce the evidence it needs to win declaratory relief in its favor. As for Liberty's use of negotiation evidence to prove that the settlement was a voluntary payment—the court does not need to make a ruling because it declines to rule on the voluntary payment issue in this memorandum decision. In sum, MBI's Rule 408 objects are overruled.

## II. SUBSTANTIVE LAW

In its memorandum decision on Liberty's first motion for summary judgment, the court denied Liberty's request for a ruling that it need not indemnify MBI's losses in the Satterthwaite litigation. ECF No. 157. MBI now turns the table and brings its own motion for summary judgment, asking the court to hold that Liberty does indeed have a duty to indemnify. The court declines this invitation.

At trial, Liberty must satisfy two burdens to prevail on its declaratory judgment action that it has no duty to indemnify MBI. First, Liberty must establish the meaning of its Professional Services Exclusions. Second, it must prove that the tortious actions that led to MBI's liability in the Satterthwaite litigation fall entirely within these Exclusions. The core thrust of MBI's motion

---

[3] A detailed explanation of this argument is provided in Section II.2.b.

for summary judgment is that Liberty cannot possibly meet its second burden because, under Pennsylvania law, this court may not look beyond the four corners of the Satterthwaite's complaint to determine whether Liberty's Professional Services Exclusions apply since the underlying litigation in this matter was settled. If the court agrees with MBI, Liberty will not be allowed to introduce the evidence required to show that it has no duty to indemnify MBI. This holding would necessitate that the court grant summary judgment.

To decide MBI's motion, the court first examines whether it may look outside the four corners of the Satterthwaite complaint to determine Liberty's coverage liability. The court decides that it may. Next, it determines if there is a genuine dispute of material fact over whether MBI acted outside the scope of the Professional Services Exclusions. The court holds that there is such a dispute of fact. Then, the court briefly explains that it will not rule on Liberty's argument that MBI's voluntary settlement payment negated Liberty's duty to indemnify. Finally, the court concludes that it must deny partial summary judgment.

## A. INDEMNITY FOLLOWS DEFENSE

Under Pennsylvania law, it is well established that an insurer's "obligations to defend [its insured] are wider than [its] obligations to indemnify." *C.H. Heist Caribe Corp. v. American Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981). While an insurer takes on a duty to defend solely based on the words of the complaint in the underlying lawsuit against its insured client, "the duty to indemnify cannot be determined merely on the basis of whether the factual allegations of the complaint potentially state a claim against the insured." *Am. States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 63 (Pa. Super. Ct. 1998)). Instead, "an insurer is entitled to an opportunity to introduce evidence that goes beyond the four-corners of the underlying tort complaint to prove the applicability of a subject policy exclusion in the coverage action." *Liberty Mut. Ins. Co. v. Penn Nat'l Mut. Cas. Ins. Co.*, No. 20-3468, 2021 WL 5401543, at *4 (3d Cir. Nov. 18, 2021) (cleaned

12

up) (quoting *Regis Ins. Co. v. All American Rathskeller, Inc.*, 976 A.2d 1157, 1161 (Pa. Super. Ct. 2009)).

Though the duty to indemnify does not inevitably follow the duty to defend, in certain instances Pennsylvania courts have ruled that it must. Specifically, "where the underlying tort case has been settled, [an] insurer[] may seek resolution of only the factual disputes that would not have been resolved had the underlying tort suit been tried." *Penn Nat'l*, 2021 WL 5401543 at *4. This means that "where the coverage suit raises factual disputes about coverage that would have also been addressed in the settled underlying litigation, such disputes cannot be resolved in the coverage action." *Id*. "In such a situation, Pennsylvania law provides that the duty to defend itself triggers the duty to indemnify." *Id*. (citing *Pac. Indem. Co. v. Linn*, 766 F.2d 754, 766 (3d Cir. 1985)). Pennsylvania has adopted this rule in order to avoid a perverse scenario where an insurer defends an insured, settles the case by agreeing to an unreasonably large settlement payout, and then refuses to pay the settlement it negotiated. *Linn*, 766 F.2d at 766.

While the "indemnity follows defense" may seem expansive at first glance, the theory is not a blanket rule that applies to all cases in which an underlying dispute is settled. *Am. States*, 721 A.2d at 64 ("Thus, we will not adopt a blanket rule that if there is a breach of a duty to defend and a settlement, then it automatically requires the breaching insurer to indemnify."); *Am. Western Home Ins. Co. v. Donnelly Dist., Inc.*, 523 Fed. App'x. 871, 875 (3d Cir. 2013) ("Pennsylvania courts have explicitly rejected [appellant's] expansive reading of *Linn*, and explained that there is no blanket rule giving rise to a duty to indemnify."). Rather, Pennsylvania courts have developed two prerequisites that a dispute must meet before they will exclude evidence beyond the underlying complaint: "(1) that the nature of the case [is] one with multiple parties, multiple theories of liability, and settlement[,] making liability among competing parties impossible to determine and

(2) there must be a concern that an insurer could foreclose indemnification by its conduct relative to the underlying lawsuit." *Liberty Mut. Ins. Co. v. Penn Nat'l Mut. Cas. Ins. Co.*, 499 F.Supp.3d 130, 141 (W.D. Pa., 2020), *aff'd*, 2021 WL 5401543 (3d Cir. Nov. 18, 2021). Only when both factors are present can indemnity automatically follow defense. *Id*. at 141-42.

Pennsylvania law, thus, compels the court to ask two questions. First, did Liberty have a duty to defend MBI in the Satterthwaite suit? And second, does this coverage dispute meet the two prerequisites required for indemnity to follow defense? Examining these issues in order, the court holds that Liberty had a duty to defend and then finds that MBI does not satisfy the two prerequisites to trigger the indemnity follows defense rule. Consequently, it concludes that it may look beyond the four corners of the complaint to determine whether the Professional Services Exclusions apply to MBI's tortious conduct.

## 1. Duty to Defend

Liberty argues that before a court can apply the indemnity follows defense exception, it must first determine that an insurer has a duty to defend. *See Penn Nat'l*, 499 F. Supp. 3d at 132 (ruling first "that Penn National had a duty to defend" and then examining a "Motion for Summary Judgment on the Duty to Indemnify."); *Linn*, 766 F.2d at 759 (finding that an insurer had a duty to defend and then considering whether "the duty to indemnify must follow the duty to defend."). The court agrees. If MBI cannot prove that Liberty had a duty to defend by showing that "the factual allegations of the complaint *potentially* state a claim against the insured," then it has no grounds to request indemnification. *Am. States*, 721 A.2d at 63.

But Liberty undoubtedly had a duty to defend. This court nearly made such a ruling in its decision on Liberty's first motion for summary judgment. It held that Liberty had "not met its [summary judgment] burden to show that it had no duty to defend" because "a reasonable juror could conclude that some of the allegations [in the Satterthwaites' complaint] arise from activities

14

that do not fall into the list of professional services included in the policies and that do not otherwise require specialized knowledge or skill." ECF No. 157 at 19. The court now extends this ruling and affirmatively holds that Liberty had a duty to defend MBI.

Since this is MBI's motion, it has the burden to demonstrate that there is no genuine dispute of material fact as to whether "the factual allegations of the complaint potentially state a claim against the insured" that could give rise to a duty on the part of the insurer to indemnify the insured. *Am. States*, 721 A.2d at 63; *see Celotex*, 477 U.S. at 323. To determine whether MBI meets this burden, the court must examine both MBI's tortious actions and the meaning of the Professional Services Exclusions. First, there is no factual dispute over MBI's conduct at the crash site because, for the purposes of determining whether there is a duty to defend, the court may *only* rely on the allegations in the Satterthwaite complaint. *See Am. States*, 721 A.2d at 63. As the Pennsylvania Supreme Court has stated, "[i]t is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend." *Springfield Twp. v. Indemnity Ins. Co. of North America*, 64 A.2d 761, 762 (Pa.1949).

There is, however, the potential for a dispute over the meaning of the Professional Services Exclusions. A policy provision is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense," *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006), or "if its terms are subject to more than one reasonable interpretation when applied to a particular set of facts." *Kropa v. Gateway Ford*, 974 A.2d 502, 508 (Pa. Super. Ct. 2009). Under Pennsylvania law, "[w]hile unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Sciolla v. W. Bend Mut. Ins. Co.*, 987 F.Supp.2d 594, 603 (E.D. Pa. 2013) (quoting *Ins. Adjustment Bureau, Inc.*, 905 A.2d at 469). In its memorandum decision for Liberty's first motion

for summary judgment, the court held that the Professional Services Exclusions were ambiguous because "[t]he term 'professional services' as set forth in the policy contains only a circular definition—'[a]ll professional services performed by or on behalf of the named insured'—and a non-exhaustive list of actives that constitute professional services." ECF No. 157 at 13. The court declines to revisit this issue and once more finds the Professional Services Exclusions ambiguous.

The result of this finding is that, even though this is MBI's motion for summary judgment and the court should, thus, generally resolve disputes of fact in Liberty's favor, the Professional Services Exclusions must be strictly construed "in favor of the insured and against the insurer." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). When it strictly construes the Exclusions in favor of MBI, the court cannot determine that each of the allegations in the Satterthwaite complaint conclusively fall within the Exclusions' limits. The Satterthwaite's allegations against MBI were exceptionally broad and included several charges, such as "creating a defective, unsafe, and/or dangerous condition," that are not obviously covered by the language of the Exclusions.[4] ECF No. 157 at 18. Thus, there is a possibility that a reasonable juror could

---

[4] Specifically, the activities described in the complaint that the court previously found did not fall within the Exclusions are as follows:

A. Item f: failing to comply with the applicable traffic-control plan for the Intersection. MBI argues that this is akin to a driver running a red light or a manual laborer simply installing a stop sign in the wrong place. In other words, it does not necessarily involve "specialized knowledge, labor, or skill." *See Harad v. Aetna Cas. And Sur. Co.*, 839 F.2d 979, 984 (3d Cir. 1988).
B. Item j: creating a defective, unsafe, and/or dangerous condition. MBI argues that such a condition could arise from activities other than professional services, such as digging a hole and failing to erect a barrier around it.
C. Item h: failing to have a police officer at the site. MBI argues that having a police officer at the site likewise does not require specialized skill or knowledge.
D. Item a: failing to provide adequate signs, instructions, and traffic control devices informing motorists that left-hand turns were no longer allowed. MBI argues that this allegation falls under its PCO coverage. If the court were to read claims such as these as excluded under the Professional Services Exclusion, MBI argues that its

find that Liberty's policy covers the allegations against MBI in the Satterthwaite complaint. The court therefore holds that Liberty had a duty to defend MBI.[5]

## 2. Dual Prerequisites

A coverage dispute must meet two prerequisites before a court can rule as a matter of law that indemnity follows defense: "(1) that the nature of the case [is] one with multiple parties, multiple theories of liability, and settlement[,] making liability among competing parties impossible to determine" and "(2) [that] there [is] a concern that an insurer could foreclose indemnification by its conduct relative to the underlying lawsuit." *Penn Nat'l*, 499 F.Supp.3d at 141. The court applies the facts of this case to each prerequisite in turn, finding that they fulfil neither.

### a. *Multiple Parties, Theories of Liability, and Impossibility*

Under Pennsylvania law, the indemnity follows defense exception applies only in situations where a "settlement made it impossible to determine on what theories of liability, if any, the underlying claimants would have prevailed had each claim gone to trial, thereby precluding a determination of which insurer's policy coverage applied." *Am. States*, 721 A.2d at 64. The purpose of this prerequisite is to prevent insurance companies that are locked in a dispute over who will pay a settlement from fully litigating an underlying dispute in a coverage case. Without the rule, parties would be effectively forced "to try the Underlying Action before then trying the

---

> PCO coverage would be rendered illusory—any claim potentially covered under it would be excluded.

ECF No. 157 at 17-18.

[5] Liberty also argues that because MBI never explicitly moved for a determination that it had a duty to defend in its motion for summary judgment, the court cannot rule on Liberty's duty to indemnify before trial. This argument is too clever by half. By filing a motion for summary judgment on Liberty's duty to indemnify, MBI implicitly requested a ruling on Liberty's duty to defend. The court will not throw out MBI's motion simply because it did not use the right set of magic words.

coverage case, all without the participation of a principal party-in-interest in the Underlying Action." *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 250 n.3 (3d Cir. 2019). To determine if a dispute meets this prerequisite, courts examine (1) whether there are competing insurance companies involved in the coverage dispute and (2) whether "the coverage suit raises factual disputes about coverage that would have also been addressed in the settled underlying litigation." *Penn Nat'l*, 2021 WL 5401543, at *4; *Regis*, 976 A.2d at 1161 n.8.

First, the indemnity follows defense exception only applies in situations where "the duty of several competing insurers to indemnify [is] automatic after a settlement . . . [making] it impossible to determine which of the multiple insurers had a duty to indemnify."[6] *Regis*, 976 A.2d at 1161 n.8. There are not multiple *competing* insurance companies in the present case. The insurers responsible for indemnifying MBI are Liberty, MBI's general liability insurer, and Lloyd's, MBI's professional liability insurer.[7] While two insurers do constitute "multiple" insurers, the fact that Lloyd's insured MBI for its tortious conduct does not create a "competition" over Liberty's duty to indemnify. Lloyd's is not a participant in this litigation and has no stake in its outcome. Regardless of whether Liberty or MBI wins the coverage suit, Lloyd's settlement payment to the Satterthwaites will not change. This is the case because MBI's professional liability policy with Lloyd's included a self-insured retention ("SIR") that is larger than Liberty's coverage limit. ECF No 274. at 16. The Lloyd's policy SIR functions much like a deductible—under its

---

[6] The fact that the indemnity follows defense is only available in situation in which the duty to indemnify is automatic for several insurance companies indicates that the exception is aimed at situations where multiple parties may be liable for the same tortious act, the case settles, and their insurance companies litigate the liability of each of the parties in a coverage action.

[7] MBI contracted to create a wholly owned captive insurance company, Vermont General Insurance Company ("VGIC") to pay the self-insured retention ("SIR") included in the Lloyd's policy. ECF No. 274 at 16-17. This company is not a relevant insurer because it is controlled by MBI and, thus, does not have interests separate from MBI.

terms, MBI is responsible for covering the first $2,500,000 of any loss related to professional liability, after which Lloyd's reimburses MBI for its expenses. *Id*. On the other hand, MBI's general liability policy with Liberty is capped at $2,000,000, and includes a $250,000 deductible. Accordingly, if MBI were to prevail in this coverage litigation, Liberty and MBI would together pay $2,500,000, and Lloyd's would pay the rest. If Liberty were to prevail, MBI would pay $2,500,000 of the Satterthwaite settlement and Lloyd's would pay the rest. Lloyd's liability to the Satterthwaites is the same in each scenario. This coverage litigation is not a dispute among multiple competing insurers. Rather, it is a case where a single insurer has attempted to disclaim coverage while another is agnostic to and unaffected by the coverage suit's outcome.

Second, disputes meet the "competing liability" prerequisite only when the questions presented by the coverage dispute would have been resolved in the underlying suit had the litigation not settled. *Penn Nat'l*, 2021 WL 5401543, at *4. Two factual disputes must be decided in order to reach a verdict in this coverage case, neither of which would have been addressed in the underlying litigation. First, a jury will have to determine the meaning of the Professional Liability Exclusions and, second, it will have to decide whether MBI's tortious activities were professional in nature.

As in *Penn National*, the *American States* decision is instructive:

> There, the Pennsylvania Superior Court concluded that there was no automatic duty to indemnify following a settlement in a car accident lawsuit because "the settlement of the underlying tort claim [did] not ma[ke] it impossible to determine if the [insurer's] policy provided coverage." The policy at issue required determining whether the vehicle involved in the accident fell within the policy's definition of a "temporary substitute auto." "The issue of whether the vehicle being driven . . . at the time of the accident was a 'temporary substitute auto' under the terms of the [insurer's] policy [was] one that would not have been resolved in the tort litigation, even if it had gone to trial" because it was not relevant to the tort claims or any defenses. As a result, the settlement did not preclude the court from deciding whether the policy covered the claim.

*Id.* (quoting *Am. States*, 721 A.2d at 64) (citations omitted).

The Satterthwaite litigation matches the *American States* fact pattern almost exactly. Like in *American States*, the present dispute revolves around the question of whether the actions of the tort defendant fall within the coverage of its insurance policy. Neither of the two central issues that provide an answer to that question[8] were relevant in resolving the underlying tort claim or establishing any defenses in the underlying trial. First, it is hard to imagine a situation in which any party would mention MBI's insurance coverage in the underlying litigation, let alone define its exclusions.[9] Second, it is highly unlikely that a jury would tackle the question of whether MBI's activities at the crash site were professional in nature and deliver a special verdict on the issue.

The facts of *Penn National*, a case in which a court found that indemnity follows defense, are also illustrative because they are easily distinguishable from those in this coverage dispute. *See* 2021 WL 5401543. In *Penn National*, an underlying plaintiff brought a suit for damages against two companies, Cost and Flexicore, and eventually settled the action out of court. *Id.* at *4. Cost and Flexicore each held insurance policies with insurers who took over their defenses in order to avoid payment of the settlement. *Id.* Because there was no trial to determine Cost and Flexicore's underlying liability, the insurance companies went to court in a coverage suit to determine which was liable under the terms of the settlement. *Id.* On a motion for summary judgment determining whether the indemnity follows defense exception applied, the Third Circuit held that the central question in the coverage dispute and the underlying dispute were the same: who was liable to the Plaintiff Cost and Flexicore? *Id.* As a result, it ruled that indemnity did follow defense. *Id.* To decide otherwise would have allowed two trials on exactly the same ultimate issues, raising the

---

[8] The meaning of the Exclusions and whether MBI's actions were professional in nature.

[9] Indeed, any discussion of the policy would likely be barred under Federal Rule of Evidence 411.

potential of inconsistent verdicts. *Id*. Unlike in *Penn National*, here, the determination of MBI's liability to the underlying plaintiff is not the end-all be-all question of the coverage dispute. Rather, it is merely the starting point for a separate case asking entirely new questions.

Ultimately, because this coverage case involves only one insurer and because it deals with issues that would not be resolved in the trial of the underlying claim, "[t]here is nothing to indicate that in this case settlement made it impossible to determine whether coverage under the Policy was warranted." *Am. W. Home Ins. Co.*, 523 F. App'x at 875. Therefore, the court finds that this dispute does not meet the requirements of the "competing liability" prerequisite.

    *b.  Foreclosing Indemnification*

Even if the case at hand met the requirements of the first prerequisite, the court must deny MBI's motion for partial summary judgment because it does not satisfy the second prerequisite— that there is "a concern that an insurer could foreclose indemnification by its conduct relative to the underlying lawsuit." *Penn Nat'l*, 499 F.Supp.3d at 141. As previously noted, one of the reasons the duty of indemnification sometimes must follow the duty of defense is to prevent insurers from settling a case at a high dollar value and subsequently disclaiming any responsibility for payment of the claim, leaving the insured with a heavy financial burden not of its choosing. *Linn*, 766 F.2d at 766. Such a concern is not present here. Rather than the insurer crafting a settlement and forcing it on the insured, MBI negotiated its own settlement with the assistance of attorneys who were not appointed by Liberty. Indeed, when MBI asked Liberty to authorize the settlement, Liberty declined to give its blessing.

In a somewhat similar situation, the Third Circuit declined to find that indemnity followed defense. In *12th Street Gym v. Gen. Star Indem. Co.*, the court examined a scenario where the insured parties "participated and acquiesced in the settlement of the underlying case." 93 F.3d 1158, 1167 (3d Cir. 1996). It explained that the indemnity follows defense rule was "based, in part,

on the concern that an insurer would be able to settle a suit without an agreement with the insured, and attempt to avoid its duty to indemnify by claiming a jury would have found the claims in the underlying suit were not covered by the policy." *Id*. When an insured helps settle a case, it is "not exposed to the risk that influenced" this reasoning. *Id*. (citing *Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co.*, 766 F.Supp. 324, 334 (E.D. Pa. 1991) (holding the duty to indemnify exception did not apply to a case settled by the insured)). Applying this idea to the facts of *12th Street Gym*, the court held that it could look beyond the four corners of the complaint to determine the insurer's liability because the insured parties participated in settlement and were, thus, not subject to the risk that motivated Pennsylvania courts to create the indemnity follows defense exception. 93 F.3d at 1167.

The facts of the present case are even more favorable to Liberty than those in *12th Street Gym*. Here, MBI went beyond simply participating in settlement negotiations and approving the final payment. It led the final settlement process without input from Liberty and agreed to a deal without Liberty's authorization. ECF No. 252 at 16-22. But MBI contends that Liberty engaged in other forms of "tactical maneuvering" to foreclose indemnity, thus fulfilling the requirements of the second *Penn National* prong. 499 F.Supp.3d at 142. MBI alleges that Liberty tried to foreclose indemnity by constructively abandoning MBI prior to settlement of the case and leaving it stuck making a choice with no good outcome: "try Satterthwaite and have no coverage under the Liberty policy, or settle Satterthwaite and have no coverage under the Liberty policy." ECF No. 289 at 17. To back up its argument, MBI points out that in *Penn National*, the district court ruled that indemnity followed defense regardless of the fact that the insured party approved a settlement. It reasoned that,

> even though the [insured] elected to settle the claims against [him] in the underlying action, [he was] . . . nonetheless exposed to the same type of follow-along litigation

> risks that animated the analysis in *Linn*, since by its inactions (failure to respond or defend) and then actions (settling the Underlying Action as to [a separate defendant]), [the insurer] eliminated any ability to sort out in the Underlying Action who would have been found liable (including as to [the insured and the separate defendant]) and to what degree, and then flowing from those conclusions, the degree to which there were any potential indemnity coverage issues.

*Penn Nat'l*, 499 F.Supp.3d at 144. Indeed, in *Penn National*, the court was worried that after the insurer disclaimed any responsibility for defense and indemnification, it would still be able to "force an 'after the fact' trial on the liability issues in the underlying case that [previous] settlements affirmatively avoided." *Id*. at 142. Ultimately, *Penn National* sums up its core teaching as follows: a "carrier that [1] defaulted on its duty to defend and [2] then participated in the resolution of the underlying litigation, but not on behalf of the plaintiff/insured, cannot find shelter from indemnity." *Id*. at 141 n.6. Unfortunately for MBI, the facts in this case do not match those of *Penn National*.

It is not at all obvious that Liberty abandoned or disclaimed its duty to defend MBI. Liberty affirmed that it had a duty to defend MBI, even if it did reserve its right not to indemnify. It followed through on this promise by providing MBI with an attorney to defend the underlying suit. Thompson hired an expert witness, engaged in settlement negotiations with the Satterthwaites, and remained involved in the suit until it settled.

MBI responds to these facts by arguing that while Liberty afforded some pro forma assistance, it still functionally abandoned its defense. Thompson was allegedly a biased attorney whose decisions aided Liberty at the expense of MBI. MBI claims that Liberty put up roadblocks to settlement, including having its coverage counsel reject a reasonable settlement offer before even informing MBI's in house counsel. Moreover, MBI points out that Liberty brought this coverage action to clarify its duty to indemnify on the day Liberty rejected a settlement with the

23

Satterthwaites. Finally, MBI notes that, by withholding settlement authority, Liberty was merely positioning itself for its coverage suit rather than meeting its obligations to defend MBI.

But Liberty reasonably answers these charges. First, Liberty's decision to withhold authority for the final settlement of the Satterthwaite litigation does not indicate that it abandoned MBI's defense. It would have been reckless to agree to a settlement that included obligations that Liberty was unwilling to meet. Such a course of action would have essentially settled this ongoing coverage dispute, which is a case that Liberty is legally entitled to prosecute. It cannot be true that the duty to defend requires Liberty to forego or abandon its right to bring a coverage suit.

Second, MBI's decision to bring this coverage suit on the day the first set of settlement negotiations with Satterthwaite broke down does not mean that Liberty abandoned its responsibility to defend MBI. MBI produces no evidence that Liberty pulled any of its resources from the defense team at this moment, and, once more, Liberty had every right to seek a declaration of its duties towards MBI.

Third, Liberty alleges that it was actually MBI that attempted to manipulate the settlement process in order to avoid payment of the underlying claim. Liberty's statement of additional facts describes multiple instances where MBI refused to respond to requests that it share information about its professional liability insurance. ECF No. 274 at Add. Fact Nos. 41, 44-76. Liberty argues that this was a ploy to keep the Satterthwaites' settlement demands low and trick Liberty into "paying an obvious professional liability claim" ECF No. 274 at Add. Fact No. 41. Indeed, MBI's statements to Thompson seem to indicate that it attempted to manipulate the Satterthwaites. For instance, upon being informed that MBI was required to disclose its insurance policies, one of MBI's representatives asked, "Am I legally required to produce this information?" *Id*. at Add. Fact No. 64. When informed that the answer to this question was "yes," the representative replied, "This

plaintiff's firm is going to start salivating like a Russian dog once they see this $100M number." *Id*.

Fourth, while Liberty admits that it did reject the Satterthwaite's two initial settlement offers of $12,0000,000 and $52,000,000, it claims that this did not meaningfully foreclose indemnity. As an initial matter, Liberty argues that MBI certainly had knowledge of the settlement offers because Thompson, MBI's attorney, sent communications pertaining to both. If MBI wished to continue negotiations through Thompson, it could have done so. Still, MBI argues that it was improper for Liberty's coverage counsel to directly reject both settlement proposals made to Thompson—especially when Liberty's sole stated rationale for rejecting the settlement was that it did not have a duty to indemnify MBI. This conduct may well have been improper, but the fact remains that Liberty's actions did little to foreclose indemnification because the parties were unlikely to reach a settlement absent complete insurance policy information. Since MBI had withheld the existence of its professional liability insurance policies from the Satterthwaites and Liberty, all parties to the settlement negations were working with erroneous assumptions about MBI's total coverage. Indeed, after Liberty declined to engage in negotiations over the Satterthwaite's $12,000,000 offer, the Satterthwaites discovered that MBI's true coverage limit was much higher than this amount, prompting it to increase its settlement demand to $52,000,000. MBI's delay in disclosing its professional liability insurance policy in the underlying litigation and the uncertainty that it created wreaked havoc on settlement negotiations, creating a temporary situation where settlement was unlikely.

Ultimately, unlike in *Penn National*, it is not entirely clear who was gaming whom throughout settlement negotiations. Here, the insurer did not openly use delay tactics and actively refuse to defend its client in order to avoid coverage. *Penn Nat'l*, 499 F.Supp.3d at 142 (describing

page: 26 of 30

a situation where "Penn National . . . went on 'radio silence,' first ignoring that defense demand altogether, and then declining to defend [the insured] throughout the mediation process that settled the Underlying Action"). And there are credible allegations that MBI wrongfully withheld information from Liberty as to the existence of its professional liability coverage. *See* ECF No. 274 at Add. Fact Nos. 41, 44-76. It would be unfair to deny Liberty the chance to explain its case to the jury simply because there are competing accusations concerning the allegedly unethical conduct of lawyers during the settlement process in the underlying litigation.[10] The court, therefore, returns to the reliable test announced in *12th Street Gym*: parties who "participated and acquiesced in the settlement of the underlying case" do not generally require the protection of the indemnity follows defense rule. 93 F.3d at 1167.

Ultimately, the court is not convinced that Liberty "foreclose[d] indemnification by its conduct relative to the underlying lawsuit" and holds that this dispute does not meet the second prong of the *Penn National* test. 499 F.Supp.3d at 141. Because MBI fails to show that it satisfies either of the two prerequisites to trigger the indemnity follows defense rule, the court may look to evidence beyond the complaint in the Satterthwaite case to determine whether Liberty had a duty to indemnify MBI for the Satterthwaite settlement.

### B.  BURDEN OF PROOF

The court now confirms that there is a genuine dispute of material fact over whether Liberty's Professional Services Exclusions apply to MBI's tortious acts. An insurer is required to indemnify only when its insured is held liable for a claim actually covered by an insurance policy. *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 611 (W.D. Pa. 2000) (citing *Linn*, 766 F.2d at

---

[10] These claims could not be resolved by this court on a separate motion for summary judgment regarding MBI's bad faith claim.

754 (3d Cir. 1985)). The burden of proving that a particular claim falls within the general coverage of a policy is on the insured. *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1366-67 (Pa. 1987). The parties do not dispute that MBI has met this burden. However, the burden shifts when an insurer relies on a policy exclusion as the basis for denying coverage. When this occurs, the insurer has the burden of proving that the exclusion applies. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009). The burden of proving whether an exclusion applies is split into two parts, the second of which is most essential: (1) The burden of proving the meaning of the exclusions; and (2) the burden of proving that the insured's tortious actions fall within the exclusions. *See, e.g.*, ECF No. 157 at 12-14, 15.

Liberty has not met the first part of its burden to show that an exclusion applies because it fails to establish a broad meaning of the Professional Services Exclusions. As previously explained, the court adopts a narrow interpretation of the Exclusions because their meaning is ambiguous. *See* Section II.A.1; ECF No. 157 at 12-14. Where a policy exclusion is ambiguous, it is to be strictly construed "in favor of the insured and against the insurer." *Standard Venetian Blind Co.*, 469 A.2d at 566. Under Pennsylvania law, "[w]hile unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Sciolla*, 987 F.Supp.2d at 603. But this does not mean that the court may not grant summary judgment to an insured moving party if an ambiguity is present. *Id*. (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 982 (Pa. 2001)). Where the facts of a case cannot meet the requirements of any reasonable interpretation of an exclusion, summary judgment is appropriate. *Id*.

But even with a narrow interpretation of the Exclusions, the court finds that Liberty meets its burden of proof at the motion for summary judgment stage because it produces evidence suggesting that MBI's tortious acts were not covered by the disputed insurance policy, even when

27

the meaning of the Exclusions is narrowly construed.[11] Unlike on its first motion for partial summary judgment, as the non-moving party, Liberty's burden is not to show that there is no genuine dispute of material fact as to whether MBI's actions fell entirely within the Professional Services Exclusions. Rather, Liberty must simply show that there is evidence sufficient to convince a jury that MBI's tortious conduct fell within the Professional Services Exclusions. *Anderson*, 477 U.S. at 248. It does just this.

MBI offers only one argument that Liberty does not meet its summary judgment burden in a world where the court may examine evidence outside the four corners of the complaint in the underlying lawsuit. With no reference to caselaw, it asserts that Liberty's theory that MBI's actions were professional in nature is immaterial to the coverage dispute because Liberty did not rely on that theory when it decided not to indemnify MBI. It may be true that Liberty did not have all the facts or articulate a correct theory when it chose to reserve its rights, but MBI's argument is still flawed because the issue at hand is only whether MBI's actions fall within the Professional

---

[11] For instance, Liberty argues that MBI's PSA to redesign and rebuild the intersection of 11400 South and Bangerter highway did not require it to perform any physical work at the intersection. Rather, it designated MBI as the project's lead designer and assigned it responsibility for creating the traffic control plan. ECF No. 274 at Add. Fact Nos. 1-2, 5. Moreover, the PSA stated that MBI's design services had to "conform to all professional engineering principles generally accepted as standards of the industry," which were defined as "the care and skill ordinarily used by members of the design profession. . . ." *Id*. at Add. Fact No. 7. MBI does not dispute that it acted only within the confines of the PSA.

Additionally, Liberty points out that all of the work MBI performed on the Bangerter project was overseen and performed by employees who were licensed engineers. *See id*. at Add. Fact Nos. 17-22. MBI itself seemed to state in a deposition that this meant that nearly all the services provided by its employees on the Bangerter project were professional services. ECF No. 272-1 at 38:7- 44:25. It offered this heuristic to determine whether a service was professional or not: "If a professional engineer is required to be involved, I feel clearly defines a professional service . . . . But if a nondegreed [sic], nontechnical background person can execute the work, I believe it's not a professional service." *Id*. at 44:8-13. If a jury applies MBI's own definition of "professional services" to the design work performed at the Bangerter intersection, Liberty could possibly succeed at trial by establishing that all negligent work on the project was performed by MBI's engineers, who were simply performing work matching their qualifications.

Services Exclusions. An examination of Liberty's state of mind at the time it made this decision is irrelevant to the existence of Liberty's duty to indemnify.[12]

Ultimately, the court finds that there is a genuine dispute of material fact as to whether MBI's tortious acts fall within the Personal Services Exclusions. As such, the court will deny MBI's motion for partial summary judgment and the declaratory judgment action will advance to a trial that will focus on of the meaning of the Exclusions and whether MBI's tortious actions at Bangerter Highway were professional in nature.

### C.  VOLUNTARY PAYMENT

Fearing that it might not have convinced the court that it does not have a duty to indemnify, Liberty argues that this motion for summary judgment should be denied because MBI breached its CGL insurance contract by settling with the Satterthwaites absent Liberty's consent. The court declines to decide this issue. Liberty has already shown that there is a genuine dispute of material fact as to whether it has a duty to indemnify. Thus, there is no need for the court to take up this issue now.[13]

### CONCLUSION AND ORDER

The court DENIES MBI's motion for partial summary judgment.

---

[12] It may, however, speak to MBI's bad faith claim at trial.

[13] The court examined a similar issue in its decision on Liberty's second motion for summary judgment. In that context, Liberty's argued that the voluntary payment provision of the CGL contract barred MBI's recovery of attorney's fees. The court found this argument unpersuasive. ECF No. 241 at 18-22. If the court were required to make a ruling on the voluntary payments issue in this motion, it would likely apply a similar analytic framework.

DATED August 18, 2023

BY THE COURT

Jill N. Parrish
United States District Court Judge